```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3   CARA BARBER, et al.,          ) CIVIL NO. 14-00217HG-KSC
                                   )
 4            Plaintiffs,          ) Honolulu, Hawaii
                                   ) June 26, 2014
 5        vs.                      ) 10:00 A.M.
                                   )
 6   OHANA MILITARY COMMUNITIES    ) Defendants Motion to Dismiss
     LLC, et al.,                  ) Plaintiff's Class Action
 7                                 ) Complaint For Damages
              Defendants.          )
 8   _____)

 9                 TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE HELEN GILLMOR,
10             SENIOR UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiffs:      Patrick Kyle Smith
                              Jill Ward
13                            Lynch, Hopper, Salzano & Smith
                              970 N. Kalaheo, Pali Palms, Ste
14                            A301
                              Kailua, HI 96734
15
                              Terrance M. Revere
16                            Malia R. Nickison-Beazley
                              Revere & Associates, LLLC
17                            970 North Kalaheo Avenue, Suite
                              A-301
18                            Kailua, HI 96734

19   For the Defendants:      Randall C. Whattoff
                              Goodsill Anderson Quinn & Stifel
20                            LLLP
                              First Hawaiian Center
21                            999 Bishop St Ste 1600
                              Honolulu, HI 96813
22

23

24

25
```

```
 1     APPEARANCES (Cont'd):

 2     Official Court              Cynthia Ott, RMR, CRR
       Reporter:                   United States District Court
 3                                 P.O. Box 50131
                                   Honolulu, Hawaii  96850
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
       Proceedings recorded by machine shorthand, transcript produced
25     with computer-aided transcription (CAT).
```

```
 1   THURSDAY, JUNE 26, 2014                          10:00 A.M.
 2            THE CLERK:  Calling the case of Civil 14-00217HG-KSC,
 3   Cara Barber, et cetera, et al., versus Ohana Military
 4   Communities LLC, et al.  This hearing has been called for
 5   defendants motion to dismiss plaintiff's class action complaint
 6   for damages.  Appearance by counsel.
 7            MR. SMITH:  Good morning, Your Honor.  Kyle Smith on
 8   behalf of plaintiffs, Cara Barber.
 9            THE COURT:  Good morning.
10            MR. REVERE:  Good morning, Your Honor.  Terrance
11   Revere on behalf of the plaintiffs as well.
12            THE COURT:  Good morning.
13            MR. SMITH:  Your Honor, we also have several, Malia
14   Nickison-Beazley from our office, Joe Fritoli, and Jill Ward
15   from our office.
16            THE COURT:  Good morning.
17            MR. WHATTOFF:  Good morning, Your Honor.  Randy
18   Whattoff for defendants.
19            THE COURT:  Good morning.  It's your motion,
20   Mr. Whattoff.
21            MR. WHATTOFF:  Your Honor, do you have any preference
22   for the podium or here?
23            THE COURT:  No, I don't really care, now that we have
24   good microphones.  But let me apologize for not wearing a robe,
25   it just doesn't fit over my dislocated elbow, but soon it will.
```

1          MR. WHATTOFF:  Your Honor, our motion is based on

2     three basic arguments, first we argue that plaintiffs failed to

3     plead there was anything actually wrong with the soil around

4     their homes.  Plaintiffs' core allegation in their complaint is

5     that the soil exceeded tier 1 levels, but there is nothing

6     necessarily unsafe or improper about tier 1 levels.

7          The second basis for dismissal here is that the

8     complaint contains no allegations about the state of the

9     neighborhoods when plaintiffs actually lived there.  During the

10    2000s, both the military and defendants engaged in extensive

11    redevelopment in those areas, and in doing so, they made

12    substantial efforts to resolve any issues with the soil.

13         Third, there are a myriad of legal problems with

14    plaintiffs individual claims.  Indeed, plaintiffs even offered

15    to voluntarily remove one of their claims in their opposition.

16         Now, with respect to the first issue, in their

17    opposition, plaintiffs essentially agreed that there is nothing

18    inherently unsafe or improper about tier 1 levels.  Plaintiffs

19    recognize that these are essentially screening levels.

20    Basically, where a landowner or developer is looking at a piece

21    of property, they can use these tier 1 levels to quickly

22    determine whether that property is automatically safe for all

23    purposes or whether additional investigation needs to be done.

24         Now, while plaintiffs seem to recognize in their

25    opposition the tier 1 levels are -- there's nothing necessarily

1   unsafe or improper about tier 1 levels, they absolutely do not

2   recognize that in their complaint where they allege that the

3   soil is dangerous merely because it exceeds these tier 1

4   levels.  And this point is made, for instance, in paragraphs

5   28, 35, 82, 111, 122, 132 of the complaint.

6          Now, despite all of this, in their opposition brief

7   plaintiffs argued that our motion should be denied because

8   there were tier 2 exceedances as well.  Now, the most

9   fundamental problem with this argument is that it's nowhere in

10  the complaint.  Plaintiffs opposition brief contains a lengthy

11  discussion about what tier 2 exceedances are.  They contend

12  that defendants improperly calculated what the tier 2

13  exceedance is, but none of that is in the complaint.  And

14  that's a fundamental problem for a number of reasons, but I can

15  give you one example.

16         There are a number of different neighborhoods at the

17  base, and the remediation of the soil in different

18  neighborhoods were handled differently.  For instance, where

19  the military did redevelopment, it handled soils in one way,

20  where Forest City did redevelopment and in the areas where it

21  demolished and built new homes, it removed all of the soil from

22  around the homes if there was a single tier 2 exceedance in the

23  neighborhood.

24         So if this case is going to be a case about tier 2

25  exceedances as opposed to tier 1 exceedances, defendants are

1   going to have a very different defense to this case.  We'll

2   come in and argue to the extent there were any tier 2

3   exceedances in the past, they were properly handled.  But if

4   this is a case about tier 1 exceedances, then we have a very

5   different defense to this case.

6          So our ultimate point here is that without a complaint

7   stating what are plaintiffs actual claims in the case, what is

8   at issue, it's impossible for defendants to properly respond to

9   the complaint.

10          Now, the second basis for his motion is the fact that

11   plaintiffs do not allege they actually lived in the

12   neighborhoods when there were any of these tier 2 exceedances.

13   This is a fundamental failure.  If there were no exceedances

14   when the plaintiffs lived there, there's no damages, there's no

15   causation, there's no basis to hold defendants liable.

16          In their opposition, plaintiffs contend that

17   defendants conducted extensive testing, that defendants

18   established that MCBH soils were contaminated with pesticides

19   not just in excess of tier 1 levels but also tier 2 levels.

20   This generally isn't disputed, but as I stated, after these

21   tests were conducted, extensive remediation efforts were done

22   by both the military and defendants.  I believe plaintiffs know

23   this, which is why they have not pled there were any tier 2

24   exceedances near their homes while they actually lived in them.

25          It is simply irrelevant for this case, whether there

1   were tier 2 exceedances at some point in the past before

2   plaintiffs ever lived there and before defendants managed the

3   homes.  Finally, with respect to the legal issues with the

4   individual claims, I'm not -- I didn't plan to go through all

5   of the individual claims here.  If the court has any questions,

6   I'm happy to answer them.

7          The one point that I wanted to make was that one

8   problem that runs through, I think, many of the claims is a

9   failure to plead sufficient facts that would support the

10  claims.  For instance, with respect to plaintiffs breach of

11  contract claim, plaintiffs have not actually alleged what are

12  the provisions of the contract the defendants allegedly

13  breached.

14         With respect to the claims for breach of the implied

15  warranty of habitability, violation of the landlord-tenant

16  code, and negligence, plaintiffs failed to explain how these

17  statutory or common law duties were breached.

18         With respect to the claims, the sound in fraud, these

19  are not pled with particularity as are required.  For instance,

20  plaintiffs contend that defendants did not make sufficient

21  disclosures about the pesticides at issue, but plaintiffs don't

22  allege what should have been disclosed to the homeowners.

23         Plaintiffs have another theory of fraud where they

24  discuss statements about growing vegetables and fruits on the

25  property.  Plaintiffs don't allege when those statements were

1   made, what was the specific content of those statements, and I

2   think the reason they don't allege that is because I think the

3   statements they were referring to are statements that were made

4   after plaintiffs had obtained counsel and after plaintiffs had

5   threatened suit in this matter which would severely undermine

6   any reliance there.

7          So without these facts, plaintiffs have failed to save

8   any claims.  In conclusion, I think that the reason the

9   plaintiffs complaint has all of these issues is because

10  defendants have not done anything wrong here.  The pesticides

11  at issue were the only pesticides that existed for fighting

12  termites in the '50s, '60s, and '70s, and they were, therefore,

13  applied universally throughout Oahu.  It is common to find

14  these pesticides around older homes throughout the island.

15  People have lived around them for decades without problems.

16         Despite this, defendants took extensive and

17  conservative efforts when they were redeveloping the property,

18  steps that were reviewed and approved by the Hawaii Department

19  of Health.  For all of the foregoing reasons, we respectfully

20  ask that you dismiss the complaint.  Thank you, Your Honor.

21         THE COURT:  Do you believe that there is a mediation

22  requirement in the lease?

23         MR. WHATTOFF:  Your Honor, there is a mediation

24  provision in the complaint.

25         THE COURT:  In the lease.

 1          MR. WHATTOFF:  I'm sorry, in the lease, you are

 2   correct.  We received a request for mediation from plaintiffs

 3   attorneys prior to the lawsuit being initiated.  Defendants

 4   responded to that request.  We laid out, sent them a detailed

 5   letter explaining why we didn't think there was any allegations

 6   here and saying that unless plaintiffs could explain why they

 7   had proper allegations we did not intend to mediate.  And we

 8   never heard back on that letter, I don't think.  Plaintiffs

 9   immediately went and filed this lawsuit.

10          THE COURT:  Okay.  Thank you.

11          MR. SMITH:  Good morning, Your Honor.

12          THE COURT:  Good morning.

13          MR. SMITH:  I'm not sure if a dislocated elbow is

14   anything like a dislocated thumb, but I did that a month or two

15   ago and it hurt horribly.

16          THE COURT:  No.  That would be a no.

17          MR. SMITH:  I can only imagine.

18          THE COURT:  And you're Mr. Smith?

19          MR. SMITH:  Yes, Your Honor.

20          THE COURT:  Okay.

21          MR. SMITH:  My name is --

22          THE COURT:  But I appreciate the connection, but, no.

23          MR. SMITH:  Well, I couldn't even brush my teeth with

24   it, and it still hurts just to hold a pencil, yeah.  I'm sure

25   it's much, much worse.  It's terrible.

```
 1              THE COURT:  Actually, it was incredibly painful, but
 2   they said to me after you put it back, it won't be painful.
 3   And I thought, how is that possible?  And it's true, it's
 4   really not painful.  It's just painful when you tear all the
 5   ligaments and the tendons, and once they put it back, your arm
 6   goes, okay, I'm going to heal now.
 7              MR. SMITH:  Right.  Thank you very much.  Exactly.
 8              THE COURT:  So it's not so bad.  Maybe the thumb is
 9   worse.
10              MR. SMITH:  The dislocation wasn't bad, as you
11   mentioned, it's the tendon tears that hold it in place.  And
12   you wear the brace, but at some point you have to, like, move
13   off the training wheels, and it's no fun.  And anyway, so it's
14   neither here nor there.
15              THE COURT:  I'll be careful not to dislocate my
16   thumbs.  I'll stay with the elbows.
17              MR. SMITH:  I wouldn't recommend that either.
18              THE COURT:  Okay.
19              MR. SMITH:  I don't think I need to belabor the point
20   of a Rule 12(b)(6) motion, but essentially it's to make sure
21   that a complaint has plausibility.  And that's the new Iqbal
22   and Twombly standards, essentially, that say it's not enough to
23   just plead, just bear allegations of this is a cause of action
24   and you breached it and there we go, but you actually have to
25   have some facts attached to that framework in which to hang a
```

1   case upon.

2           And with that being said, I do want to address some of

3   the concerns that have been raised by defendants, and also make

4   sure it's clear that the point of a 12(b)(6) motion is not to

5   encourage essentially intentional ignorance on the part of

6   defendants, who essentially play a game that we're moving to

7   dismiss because you don't know exactly how bad we were when you

8   filed our complaint.  And that's essentially what's going on

9   here.

10          There's several balls in the air, if you will, that

11  are brought by the motion of defendants.  There is essentially

12  the two overarching umbrella arguments, and the first one is

13  that this tier 1, tier 2 exceedance argument.  The essential

14  position defendants have taken is that a tier 1 exceedance by

15  itself is not enough to support causes of action under our

16  complaint, negligence and breach of contract and these kind of

17  things.

18          I would note the only support for that argument that's

19  brought or provided to the court by defendants is that Tilot

20  Oil case, and as we addressed in our opposition, Tilot Oil

21  doesn't stand for anything of the sort.  In fact, that's

22  conceded in the reply which says, oh, well, what you argued

23  about Tilot Oil in your opposition is essentially what we

24  meant.  What Tilot Oil basically says is that for the purpose

25  of an injunction, the equivalent of a tier 1 exceedance was not

1    enough because mitigation steps have been brought forward.  But

2    it by no means stands for the proposition that the equivalent

3    of a tier 1 exceedance couldn't support claims for relief under

4    common law and contract as we brought here.

5            In fact, let me just spend a little bit more time on

6    that point because our position is that a tier 1 exceedance by

7    itself absolutely would support claims for relief.  And what I

8    would analogize it to would be a speed limit.  Simply saying

9    that you breached a speed limit or you went faster than the

10   speed limit doesn't necessarily mean you're driving unsafe, but

11   it certainly doesn't mean that you were driving safe.  In fact,

12   unless you know what those actual speeds are and how much the

13   breach is --

14           THE COURT:  I'm sorry, this doesn't work for me.

15           MR. SMITH:  Okay.

16           THE COURT:  Too much criminal law background to work

17   with that one.

18           MR. SMITH:  Fair enough.

19           THE COURT:  I think you need to concentrate on

20   why -- are you taking the position that you haven't alleged

21   tier 2 violations?

22           MR. SMITH:  We absolutely do allege tier 2 violations.

23   My point, Your Honor, though is that a tier 1 violation, a 2

24   would support these causes of action, what a tier 1 exceedance

25   shows is that there are levels of contamination of concern.

1    And then you have to go out and figure out what are those

2    levels of contamination.  In this case, and it's alleged in the

3    complaint, there was testing actually done by Forest City.  In

4    fact, we talked about it, it's talked about in the pesticide

5    soil management plan.  They did over a thousand soil tests in

6    the two neighborhoods, and those tests absolutely confirmed

7    that levels were far in excess of tier 1 and tier 2 levels.

8         And if you actually look at our complaint, this is

9    paragraph 28, which says, "before taking over MCBH residential

10   housing, defendants were aware that chlorine levels were many

11   times higher than the EPA's tier 1 environmental action

12   levels."

13        It's also mentioned in paragraph 33 which says, "Upon

14   information and belief, Your Honor, in addition to heptachlor

15   chlordane, heptachlor epoxide levels in excess of tier 1 and

16   tier 2 levels, defendants were also aware of chemical

17   contamination for Aldrin, Dieldrin, and Endrin in excess of

18   these recommended limits."

19        THE COURT:  Okay.  I'm trying to figure out, you know,

20   I agree that this is a question of motion to dismiss, it's not

21   a question of summary judgment.  We're talking about whether

22   you have alleged sufficiently.  But I'm having some trouble

23   figuring out what it is that the damages that you're alleging.

24        The position of the defendant seems to be, yeah, we

25   did all this testing and then we fixed it.  And I'm trying to

1  figure out if you are saying they didn't fix it and we have

2  damages from that or they didn't tell us they fixed it.  I

3  mean, you're going to have to amend.  And I'm just trying to

4  figure out what it is that you are trying to say.

5          MR. SMITH:  Let me address that point specifically,

6  Your Honor.  So in 2006 when Ohana and Forest City Residential

7  Management, essentially these are both Forest City entities --

8          THE COURT:  And you need to deal with how you're tying

9  in the -- the agent, because they're not a signature on the

10  contract.

11          MR. SMITH:  Sure.

12          THE COURT:  And I'm not seeing in your complaint how

13  you were tying those in --

14          MR. SMITH:  I understand.

15          THE COURT:  -- and giving them responsibility.  You

16  haven't pled that sufficiently so, you know, they aren't on the

17  hook on a number of your causes of action.

18          MR. SMITH:  Let me take the first point and then we'll

19  talk about the agent.  So the first point is that in 2006 the

20  levels and the warning was made to Ohana, essentially to the

21  Forest City, it's really the same entity, but the levels were

22  known.  Testing was done.  So they originally know it's over

23  these tier 1 exceedances.  They go out and do the testing to

24  confirm, and they have many, many tests far in excess of the

25  tier 1 and tier 2s in the neighborhoods.

1          And they -- in fact, they decide the levels are so

2    severe, they don't do any more testing through the rest of the

3    base because they say what's the point, we're going to assume

4    it's all contaminated based on the level of these results,

5    okay.

6          So the two -- the two issues of what the damages are,

7    what defendants have alleged in their motion and also in their

8    reply is that well, we came in and fixed it.  We directly

9    dispute that, and that's disputed in the complaint.   In

10   paragraph 41 we say there was a plan put in place.  The plan

11   said there was supposed to be notice.  The plan was there's

12   supposed to be no dust.  The plan says that if there is in

13   excess of the tier 2, we're going to go fix it.

14         And so what they did over this period of time from

15   2006 to the present is people -- they don't tell any of the

16   military families, they allow them to move in.  And so families

17   are living on the base on soils that are contaminated.  That's

18   why it's alleged in our brief that there is contamination,

19   there's intentional exposure.  And then they went about doing

20   this phased repair through the base kicking up all kinds of

21   dust and this kind of thing.

22         THE COURT:  Are you saying that the places where

23   people moved in had this problem or places around them had this

24   problem?

25         MR. SMITH:  Both.

1          THE COURT:  Because I'm not getting that out of your

2    complaint.  It's not sufficiently clear.

3          MR. SMITH:  Well, Your Honor, we allege that this plan

4    to fix the base housing of chemical and pesticide contamination

5    was not implemented.  There's then been an allegation that it

6    was implemented, in fact, one of the reasons why we demanded

7    mediation was because our families wanted to know what have you

8    done at my home, okay.

9          And so to some extent, exactly what they did at a

10   certain address is still unknown, and that was refused to be

11   provided by Forest City.  So the way the complaint is alleged

12   is there's chemical contamination that's known, it's confirmed.

13   They allow families to lease in the base, and then as they

14   repair a home, they maybe move this family out and are

15   repairing this neighborhood, families are living right

16   alongside that reconstruction project.  And so the dust and

17   these things are blowing from the reconstruction project.

18          But also for the families that are still living

19   on-site, there's been no mitigation.  There is

20   pesticide-contaminated soils, and the only disclosure that

21   those families received is, hey, chlordane was used in the

22   United States, even though the entire time their landlord knows

23   that the levels are far in excess of tier 1 and tier 2 levels,

24   hundreds, in some cases, thousands of percent higher.

25          So it's both.  Families are living on base soils that

1  are contaminated during this period of time, and they're also

2  being exposed to the reconstruction fugitive dust and these

3  things coming from this effort.  Meanwhile, their landlord is

4  not telling them anything.  They're not saying, hey, this dust

5  that's blowing in from construction that's right next door,

6  literally 10 yards away from some of the homes, might be

7  contaminated with pesticides.  And they're certainly not

8  telling you when a family moves into the base, hey, when your

9  kids or pets are playing in the yard, these soils are

10  contaminated with pesticides, and that's clear.  We cite that

11  in the complaint.  That's the chlordane disclosure.

12        It's part of the Forest City or the Marine Corps

13  residential -- I forget the precise, but the handbook, that's

14  actually provided to you and you sign off on it when you get

15  the lease.  It's essentially incorporated in the lease.  And so

16  this argument that we don't know when this disclosure is made

17  or this improper fraudulent omission, it's made right when that

18  lease is done.  You sign the lease.  You get the handbook.  It

19  says nothing that you're moving into a property that has

20  pesticide contaminated soils.

21        THE COURT:  What I am concerned with at this point --

22        MR. SMITH:  Yes, Your Honor.

23        THE COURT:  -- is a sufficient articulation of your

24  claims as opposed to a more general articulation.  For

25  example --

1          MR. SMITH:  Yes, Your Honor.

2          THE COURT:  -- saying that at some point dust, at some

3    point dust was released, it doesn't help with a -- there's no

4    particularity.  There's no location.  There's no time.  There's

5    no way of saying who and what were damaged at that point in

6    time.  Was it last week?  Was it, you know, two years ago?  Who

7    was living there at that point?

8          I mean, you don't have sufficient particularity at

9    this point with respect to that.  But go ahead with the rest of

10   your argument.

11         MR. SMITH:  Well, and I understand -- I understand

12   Your Honor's concern on the dust.  The dust presumably would

13   have been as construction proceeds through the development.

14         THE COURT:  You've got to put it in your complaint.

15   It's not enough to tell me now.

16         MR. SMITH:  I recognize that.  I recognize that, Your

17   Honor.  But my point is that as far as this failure to

18   disclose, this failure to warn, that certainly spans the

19   entire --

20         THE COURT:  I'm not too worried.  I mean, I believe

21   you probably properly pled one part of your cause of action in

22   that when the disclosure just says the United States and you're

23   alleging that these other things are happening, but that's just

24   a very small part of your complaint, you know.  You've got like

25   10 or 13 causes of action, and that's just one of them.  When

1   you're getting into fraud and when you're getting into what

2   kind of injury there is, that's a whole nother problem.

3          And there's a whole bunch of law out there that I

4   don't think has been taken into account in terms of how you're

5   pleading the issue of medical monitoring.  I mean, there's a

6   lot of law in the Ninth Circuit and nationally, and it's pretty

7   much, you know, across the board there's a spectrum of where

8   people are in this.

9          MR. SMITH:  That's right.

10          THE COURT:  And I think you have to look at that a

11   little more carefully in terms of how you want to plead that.

12          MR. SMITH:  Well, I recognize as far as that remedy,

13   to some extent until it's confirmed what the different levels,

14   pardon me, as the phasing of the construction went through, so

15   what community, part of the community is living on the impacted

16   soils.  And then as they -- presumably, it's been represented

17   at least, as they fix homes, they then move family members into

18   the fixed areas.  So that issue of the medical monitoring, I

19   definitely take Your Honor's point.

20          With respect to the second broad umbrella argument

21   that they make is this argument that people weren't living on

22   the base during this time.  We absolutely allege that they

23   were.  And our class representatives who were proposed lived

24   there through the entire 2006 timeframe to the present on

25   behalf of the class.  There were absolutely families living on

1    actually contaminated home sites during this process, during

2    this period.

3              Likewise, there's families who are living on

4    ostensibly reconstructed homes where they claim they moved the

5    soil, but are still living next to the construction phasing of

6    this repair of contaminated soils.

7              THE COURT:  It's not clear from your complaint.

8              MR. SMITH:  Okay.  I understand, Your Honor.

9              THE COURT:  Go ahead.

10             MR. SMITH:  Your Honor, I'm prepared to go through

11   each of the different causes of action as well, although I

12   don't want to, you know, I'd really rather be focused in to

13   address Your Honor's actual concerns.

14             THE COURT:  Oh, no, go ahead.  Go ahead and make your

15   argument.

16             MR. SMITH:  Fair enough, Your Honor.  With respect to

17   breach of contract, in the very beginning, in the motion it

18   claims that, well, what contract are you talking about, what

19   provisions are you talking about.  We cited the lease, and we

20   cited specific lease provisions in the complaint.  I could

21   point Your Honor to those.

22             THE COURT:  No, I saw that.

23             MR. SMITH:  Yes.  I'll move on from that.  I do take

24   Your Honor's point that Forest City Residential Management is

25   the agent and, therefore, probably not the proper party, at

 1   least on the evidence that we have in front of us, to argue

 2   that they are a party to the breach of contract.

 3           And that would carry down, these other claims that are

 4   part of this contract, for example, the breach of warranty of

 5   habitability essentially becomes a clause in a contract is one

 6   way to think about it.  I know it gets pled differently, but

 7   that is the clause of the contract.  There's a warranty of

 8   inhabitability.  We do withdraw our tortious breach of

 9   contract.  The breach of the landlord-tenant code --

10           THE COURT:  That's good, because that was the case I

11   sent over to certify to the Hawaii Supreme Court.  So, good

12   idea.

13           MR. SMITH:  Good idea.  I recognize that.  It's always

14   funny on that because that claim still gets pled in state court

15   all the time and litigated all the way to the end, right.

16           It's fine.  It's quite clear that we're happy to --

17           THE COURT:  Those parties tried to settle and the

18   Supreme Court wouldn't let them, they wanted to settle the

19   issue, so they ruled anyway.

20           MR. SMITH:  Your Honor, with respect to the breach of

21   landlord-tenant code, again, it was pled as a separate claim,

22   but, essentially, it's a part of the contract.  And so to the

23   extent that's not clear, it's incorporated specifically within

24   the lease agreement between the parties that the provisions of

25   the landlord-tenant code would apply.

1          So to the extent Your Honor felt like dismissing that

2     as a separate claim, it's sort of neither here nor there

3     because it's part of that contract.  It's also relevant, I

4     would argue, to negligence as a standard that breach of sort of

5     a recognized sort of statutory code of conduct can be evidence

6     of negligence as well.

7          The unfair and deceptive trade practice, this is a key

8     issue, and it ties in with the fraud claims.  It's all sort of

9     the same course of conduct.  The essential arguments that's

10    been brought by defendants is that we don't plead it with

11    particularity, the who, what, when, and where.  These claims

12    really focus, not on the dust, and, again, Your Honor's points

13    on the dust are well taken, but specifically upon the

14    disclosure and the failure to disclose.  And so if you look at

15    the U.S. Steel case, it's not fraudulent intent, it's

16    essentially a tendency to mislead.  And that's the standard.

17         And so as far as the who, we're clear on the

18    complaint, it's paragraph 80, it's the class plaintiffs.  As

19    far as the what and where, again, it's clear in the complaint,

20    it's section 82.  It's to entice or entice military families to

21    enter leases with defendants at Marine Corps Base Hawaii.  They

22    did not disclose pesticide contaminated soils.

23         As far as the when, it's paragraph 83, it says, "after

24    entering leases with class plaintiffs, defendants asserted it

25    is safe for families to work and play in their yards."  Again,

1    that's specifically taken from that disclosure that talks about

2    the U.S., chlordane in the U.S., and this kind of thing, that

3    specific language.  Yes.

4              THE COURT:  But where are your damages?

5              MR. SMITH:  The damages are that if I'm a military

6    tenant and I want to go get an apartment with my family or,

7    pardon me, a house with my family, I get a basic housing

8    allowance that I can spend on the open market.  I can go to

9    Kailua, Kaneohe, wherever.

10             THE COURT:  Are you saying that it's just the rent

11   that got paid?  That's what I'm trying to determine right now

12   is are you attempting to look at this like an asbestos case, or

13   you've mentioned the HIV case, et cetera, you know, the damage

14   in terms of the carcinogens, that's a lot harder to prove.  And

15   we don't really have, in this complaint, a sufficiently

16   articulated cause of action that relates to those kinds of

17   damages.

18             If you're just talking about they wished they'd spent

19   their money some place where they weren't worried, yeah, you've

20   articulated that, but I'm trying to figure out --

21             MR. SMITH:  Yes, Your Honor.

22             THE COURT:  -- what you're articulating with respect

23   to the damages that flow from carcinogens in the soil.  That's

24   where I don't see --

25             MR. SMITH:  Sure.

1           THE COURT:  -- a connection.

2           MR. SMITH:  Let me be crystal clear on that.  This

3  complaint does not seek personal injury on behalf of individual

4  military families, children, spouses, et cetera.  We're not

5  trying to prove that pesticide contamination at a certain house

6  caused cancer in little Johnny, okay?  This complaint seeks for

7  damages.  It is the rent that these -- this community paid to

8  this company that didn't disclose to all of these thousands of

9  military families, and that's the primary monetary damages.

10          THE COURT:  But why -- you still come over to the same

11 other question, what is their damage?  You have to deal with

12 what being in that location, what caused them, is it just

13 intentional infliction or negligent infliction of mental?

14          MR. SMITH:  Well, with respect to contract, it's they

15 didn't get what they paid for.  It's no different than if I

16 want to buy a car.

17          THE COURT:  So that's the habitability aspect.

18          MR. SMITH:  Yes, the habitability.

19          THE COURT:  And that's where you're going to have to

20 prove the inhabitability in order to collect on the rent.

21          MR. SMITH:  Sure.  With respect to the specific point

22 of inhabitability, even if you look at the unfair and deceptive

23 trade practices, it's not that you have to prove that harm in

24 order for there to be a remedy and for there to be damages,

25 it's that it was deceptive.  That's the key.  And the measure

1    of those damages under either the contract or also the UDAP

2    claims would be that rent amount.  Under theories of contract,

3    it would be something like disgorgement, for sure.  The

4    deceptive trade practices essentially looks at what you paid

5    for that product as a consumer.

6         Here, this family, this community of military

7    consumers are essentially buying housing that they're told is

8    safe, and they didn't get it.  Now, Your Honor's point is taken

9    on the emotional distress claims bleeds over into a more

10   individualized inquiry.  You know, we concede that, and I can

11   certainly make the argument for it as far as that that claim

12   should still stay part of this complaint, particularly if it

13   doesn't go forward as a class potentially.

14        But as far as a class-wide relief, I think that rent

15   payment for this product under these different theories of

16   contract and unfair and deceptive trade practices, absolutely

17   we can prove up damages on a class-wide basis.

18        In fact, it's much easier than other cases I've worked

19   on where you're looking at a community impact and you have

20   thousands of individual renters, purchasers, sellers, for

21   example, in a residential housing market.  Here, we have a

22   single renting company that knows exactly who was there, it

23   knows exactly what was paid, and knows exactly how it organized

24   its community.  So in many ways, it's much simpler.

25        THE COURT:  You still have to prove that there was

1    something wrong.

2            MR. SMITH:  True, Your Honor.  Well, and typically the

3    way you would prove there's something wrong would be, I don't

4    know, maybe something like testing within that community,

5    which, again, has been done by defendants that confirmed these

6    levels were far in excess of not just a screening level, not

7    just their own level --

8            THE COURT:  But it's my -- and we're not trying the

9    case right now.

10           MR. SMITH:  Yes.

11           THE COURT:  But I understand their position is, but we

12   fixed it.  And if they did fix it, where are you?

13           MR. SMITH:  Well, if I'm -- and, in fact, our clients

14   are these people who lived there from 2006 until they fixed it,

15   they still were exposed for those years.

16           THE COURT:  Okay.  So then we're talking about how it

17   was fixed.

18           MR. SMITH:  Yeah.

19           THE COURT:  And the impact of them during this period.

20           MR. SMITH:  Yes.

21           THE COURT:  And that's not really clear in your

22   complaint.

23           MR. SMITH:  Well, we don't know that, the factual

24   assertion made in the motion is that they fixed it.  That's

25   made in the reply and a number of places.  That's frankly

 1   beyond the 12(b)(6).  The argument is that they fixed it --

 2            THE COURT:  I know.  I'm just pointing out that, I'm

 3   hearing a slightly different argument than, because your

 4   complaint isn't clear, and I'm hearing a slightly different

 5   argument today, which is fine because that's the point --

 6            MR. SMITH:  The purpose.

 7            THE COURT:  -- of having a motion to dismiss.  And if

 8   you're in the Ninth Circuit, you always get another bite at the

 9   apple.

10            MR. SMITH:  Right.

11            THE COURT:  But I'm trying to help us not have a

12   couple of amendments and deal with --

13            MR. SMITH:  No, I appreciate that.

14            THE COURT:  -- what it is that you actually believe

15   your damage is.  And what I'm hearing now is even if they fixed

16   it, they fixed it over time and our people were exposed to bad

17   stuff.  And if that's part of your complaint, you have to

18   articulate that because if that's -- if that's all you end up

19   with that they actually did fix it but it didn't get fixed

20   until 2009, then you have to articulate, you know, the damages

21   that you're talking about or the damages of living in a place

22   where it wasn't fixed during that period and then you have to

23   deal with what is the damage, you know.

24            And that goes, relates back to what was there and

25   what -- what the effect on the people is that was there.  And

1    then we get into this other thing with the medical monitoring,

2    et cetera, which is a whole nother can of worms.

3            MR. SMITH:  Your Honor, when you draft a complaint and

4    then it gets looked at --

5            THE COURT:  You don't -- I mean, this is part of the

6    process.  You know, I'm working on a way higher level than I am

7    about 20 percent of the time, 30 percent of the time.  I'm not

8    complaining about the complaint, nor am I complaining about the

9    motion to dismiss, I'm just trying to get us to a place faster.

10           MR. SMITH:  Right.  And the point I was going to make

11   is, Your Honor, when the complaint is drafted, we allege that

12   it's not been fixed.  That's why -- one of the reasons we asked

13   for the mediation.  They've now come back and made assertions

14   that, oh, through this 2006, 2005 to 2014 period, it was

15   repaired.  And then we did it in phases.

16           And, in fact, because of this filing of the complaint,

17   this is just back story, I guess, they finally produced to

18   Department of Health and others these plans that say, oh, that

19   we did these things.  So if they did that and it was done

20   correctly, great, that may very well put a capstone on the

21   outer edge of the case theoretically, if they did it right.

22           And so we might be talking about a 2006 to 2014, let's

23   say, period, everything's fixed at this point, and they've

24   essentially cut off their liability going forward.  If that's

25   not the case though, and this is really part of what a case

1    like this is designed to also flesh out is what did they

2    actually do.  That wasn't known that they'd done any of this

3    when this complaint was filed.  And it's only through the

4    motion that this has now been asserted.

5           Going back to Your Honor's actual, I think the core

6    concern, which is let's make sure the complaint looks the way

7    it should as we go forward in the case and we're all on the

8    same page.  The core allegation of this complaint is there's

9    this period from 2006 to at least 2014 where families are

10   living on that base and they're on top of contaminated soil.

11   And if the assertion is that it's all been fixed, well, let's

12   get into that and figure out at what point the outer bound is.

13          But there's definitely a group of people who were

14   living on there during that period of time who were not treated

15   properly.

16          THE COURT:  What about the mediation issue?  Because

17   I'm wondering why we're here if you were supposed to mediate

18   these things.

19          MR. SMITH:  The mediation clause that you probably

20   looked at in the lease, what it basically says is that if you

21   don't mediate, if a mediation demand is made and the other

22   party fails to mediate, then they don't have a claim for

23   attorneys fees and costs.  And so in the sense that it's a

24   mandatory absolute mediation clause, you have to go through

25   that in order to come litigate, it doesn't read that way.

1          We made the mediation demand.  They came back and said

2     everything's fine.  We did respond.  There was a response that

3     said we don't see anything -- reason to mediate.  And so we did

4     file our complaint.  So we went through that process.

5          THE COURT:  Well, that's not exactly what Mr. Whattoff

6     is saying.  He's saying they told you what you needed to tell

7     them you were complaining about and you didn't do that.

8          MR. SMITH:  Yeah, we told them that we want to know if

9     the places where our clients are living and where this

10    community is living is safe, and they refused to tell us, so we

11    have nothing to mediate about.  Everything is fine.

12         We have clients who actually went to Forest City

13    Residential Management to ask for the plans that are supposed

14    to be kept underneath the pesticide soil management plan, not

15    available.  Didn't have them.  So yeah, we went down that

16    route.  It was a dry well, and so we brought our complaint.

17         And now Forest City sees that, oh, there's a complaint

18    out there, the mediation clause from that lease is definitely

19    not mandatory in that sense, essentially what it's done.

20         THE COURT:  But it may be an issue later on in terms

21    of the attorneys fees.

22         MR. SMITH:  True.  It absolutely is.

23         THE COURT:  Yeah.  And so I am wondering if it would

24    be helpful to have a mediation at this point, or perhaps have

25    you redo your complaint and then have a mediation --

1          MR. SMITH:  Your Honor, we'd have --

2          THE COURT:  -- which would put to rest a question of

3     whether or not attorneys fees, if there is a recovery.

4          MR. SMITH:  Your Honor, I feel like we've, you

5     know -- we've gone down that road.  We've brought the

6     complaint.

7          THE COURT:  Let me tell you, at this point in time,

8     I'm hearing two versions of the mediation.  And so what I know

9     is I have a -- at the end of this case if, you know, somebody

10    is asking for attorneys fees, I'm going to have to resolve the

11    question of mediation.

12         MR. SMITH:  True.

13         THE COURT:  And you two are not on the same page with

14    that, which could cost somebody money later on, one, just in

15    the terms of litigating it, and if you don't collect it.

16         MR. SMITH:  Right.

17         THE COURT:  So I think that is something you folks

18    should consider, but it would probably be a good idea to at

19    this point, unless you don't want it, you'd rather just go to

20    mediation, do an amendment.

21         MR. SMITH:  Your Honor, on the mediation, a demand was

22    made, the complaint was brought.  In the settlement conference

23    we've certainly discussed the idea of having some kind of

24    mediation or discussions going forward to try to resolve

25    different aspects, that was in front of Judge Chang when that

1   first came up.  So there's certainly no opposition, we're

2   always open, and, in fact, have been the party pushing that

3   piece of it.

4          I guess what I'm very frightened of is that it would

5   be used as a way to delay the case moving forward to where

6   essentially -- we are certainly discussing and want to move

7   forward with efforts to resolve aspects of the case, if we can.

8          THE COURT:  Well, it probably is better for you to

9   amend your complaint, but I think you both should consider, you

10  know, putting to rest the question of mediation at this point

11  in time, so it isn't something that a lot of attorneys fees go

12  into later with a result that one or the other doesn't like.

13         So is there anything else you want to say?

14         MR. SMITH:  Your Honor, if you have questions about

15  the pleading of fraud or the other claims, I can certainly

16  address those, but otherwise we're prepared to stand on our

17  brief.  I certainly appreciate the time you've already given

18  us.

19         THE COURT:  No, that's fine.  I think Mr. Whattoff

20  probably has something else to say, or not.

21         MR. WHATTOFF:  I'll be quick, Your Honor.  There's

22  just three points I wanted to make.  One is that this idea that

23  we've sort of been hiding the ball.  In connection with our

24  initial disclosures, defendants produced about 10,000 pages

25  that I think comprise basically all of the testing for all of

1    the neighborhoods that we have.

2          So all of the -- every time a neighborhood was

3    developed and sort of turned over from the military to

4    defendants, there was this comprehensive process it went

5    through.  And we've turned over, I think, all of that to

6    plaintiffs.  And I guess it's possible that there could be one

7    or two things missing from there given that it's a lot of

8    documents, but we've really tried to open up everything and lay

9    it out there.

10         The second point I want to address is Mr. Smith's

11   point that, well, with the -- with the remediation, maybe we

12   did it right, maybe we did it wrong.  They don't really know.

13   It seems to me that what plaintiffs are describing is basically

14   a fishing expedition in sort of the cliche that you always hear

15   about in litigation, but they don't know if there's any

16   wrongdoing here.  They have the documents.  They can look at

17   those documents.  So I do think that there is a duty on them to

18   amend their complaint to address those issues.

19         The third issue with the mediation, I'll respectfully

20   disagree with the characterization by plaintiffs.  You're

21   right, we don't see eye to eye on that.  I think that Judge

22   Chang recommended mediation or a settlement conference in front

23   of Judge Chang.  I have proposed to Mr. Smith that we do go in

24   front of Judge Chang, and I've suggested some sort of framework

25   for what that would look like.  We're certainly willing to

1   consider that, Your Honor.

2          THE COURT:  Okay.  You know, we do have people who are

3   willing to take on mediation, you know, other than Judge Chang,

4   so it's something more in depth.  Or maybe you two would

5   like -- the two sides would like to look at who would do that,

6   but it seems to me that it's in everybody's best interest when

7   you have this in the lease and it affects attorneys fees to not

8   be where you are right now where you're each pointing the

9   finger, you know, I want to do it, I did this, you did that.

10         I mean, what I see in these kinds of cases is, you

11  know, you spend, you know, huge amount of money litigating

12  whether or not you -- who is at fault in not mediating.  So why

13  not mediate and let that, put that to rest?  Because at the end

14  of the case, it's -- it's very expensive and it can have a, you

15  know, good money after bad and no return.

16         So I think that, and whether mediation is not

17  necessarily going to be something that Judge Chang can do

18  unless you structure it in a way because, you know, mediation

19  usually involves somebody who is really going to get into the

20  nitty-gritty with you.  And so that is something that we can

21  come up with or you folks can come up with on your own in terms

22  of setting that up, Judge Chang, you know, would be helpful

23  with that.

24         MR. WHATTOFF:  The only -- I think that we're willing

25  to explore either option.  I do think Judge Chang seemed to be

 1   willing to kind of dig into this when we talked to him, but

 2   we're certainly willing to discuss that with plaintiffs.

 3           THE COURT:  Then you would need to decide

 4   whether -- and what I'm trying to avoid is you would need to

 5   decide whether that meets mediation.

 6           MR. SMITH:  Sure.

 7           THE COURT:  Because what I don't want is this

 8   unanswered question.  Because right now I have a contract that

 9   says you're supposed to mediate and you're blaming each other

10   for not mediating, and, so, I don't want to be dealing with it

11   at the end -- this at the end of the case.

12           So if you are willing to look at and agree, you know,

13   on the record that Judge Chang is being a mediator, that may

14   not really be sufficient for the depth that you're talking

15   about so, you know, I think you have to address this problem

16   now as opposed to later.  I think it will -- I don't think this

17   case is going away immediately, and it would make a lot of

18   sense to lay that to rest.

19           MR. SMITH:  Your Honor, although we're concerned about

20   the mediation sort of delaying the progress of the case, we're

21   definitely not opposed, in fact, I would even just make a

22   request on the record to be ordered to mediation.  I agree, I

23   think that, frankly, a mediation in front of Judge Chang would

24   not be as effective as someone that can get down into the

25   depth.  And the mediation that's been sort of proposed, without

1    getting into details, in front of Judge Chang is really trying

2    to say we're only willing to mediate on pieces of it, and I

3    find that's not particularly effective.

4              THE COURT:  I don't think really Judge Chang, unless

5    you're both willing to agree that that's mediation, magistrate

6    judges don't have the time --

7              MR. SMITH:  I agree.

8              THE COURT:  -- that a mediator would in a particular

9    case, and so I'm -- unless, if you're not agreeing that that is

10   actual mediation then that isn't going to be, that isn't going

11   to solve the problem.

12             MR. SMITH:  Thank you, Your Honor.

13             MR. WHATTOFF:  Your Honor, one request I would

14   make -- oh, sorry.

15             MR. SMITH:  I was just going to say, I would make a

16   request on the record for you to order us to mediation.

17             THE COURT:  Okay.  And Mr. Whattoff.

18             MR. WHATTOFF:  I was just going to suggest that to the

19   extent there is going to be mediation, you'd mentioned whether

20   the amended complaint should come first or whether mediation

21   should come first, I would request that the amended complaint

22   come first so we know exactly what are the damages and the

23   claims that we're mediating.

24             THE COURT:  Well, you're never going to know exactly

25   what the damages are, because that's a little bit, you know, we

1   wouldn't bother having trials if we actually knew that.  Okay,

2   I am going to issue a short order, but I think we've gone over,

3   you know, some of the things that need to be done and you'll

4   have 30 days from the time the order issues to do your amended

5   complaint.

6           And I will talk with Judge Chang and -- about this in

7   terms of mediation, and I think it would be something that is

8   in both your best interests.  And the magistrate judge can

9   order it just as well as I can, and I think it will be better

10  if he fashions something that met all of the requirements

11  rather than me doing it in just a very broad generalized, but I

12  am saying it's something you really need to do not to have at

13  the end a problem.

14          Is there anything else to come before the court?

15  Thank you.

16   (The proceedings concluded at 10:47 a.m., June 26, 2014.)

17

18

19

20

21

22

23

24

25

1            COURT REPORTER'S CERTIFICATE

2

3            I, CYNTHIA R. OTT, Official Court Reporter, United

4    States District Court, District of Hawaii, Honolulu, Hawaii, do

5    hereby certify that pursuant to 28 U.S.C. §753 the foregoing is

6    a true, complete and correct transcript of the stenographically

7    reported proceedings had in connection with the above-entitled

8    matter and that the transcript page format is in conformance

9    with the regulations of the Judicial Conference of the United

10   States.

11

12           DATED at Honolulu, Hawaii, July 8, 2014.

13

14                          _____/s/ CYNTHIA R. OTT_____
                            CYNTHIA R. OTT, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25