GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

LISA WOODS MUNGER          3858-0
    lmunger@goodsill.com
RANDALL C. WHATTOFF        9487-0
    rwhattoff@goodsill.com
CHRISTINE A. TERADA        10004-0
    cterada@goodsill.com
First Hawaiian Center, Suite 1600
999 Bishop Street
Honolulu, Hawaii  96813
Telephone:  (808) 547-5600
Facsimile:  (808) 547-5880

Attorneys for Defendants
OHANA MILITARY COMMUNITIES, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PLAINTIFFS CARA BARBER, MELISSA JONES, MELISSA STREETER, KATIE ECKROTH, BOB BARBER, TIM JONES, and RYAN ECKROTH On Behalf of Themselves and All Others Similarly Situated,<br><br>          Class Plaintiffs,<br><br>  vs.<br><br>OHANA MILITARY COMMUNITIES, LLC, FOREST CITY RESIDENTIAL MANAGEMENT, INC.; and DOE DEFENDANTS 1-10,<br><br>          Defendants. | CIV NO 14-00217 HG-KSC<br><br>**DEFENDANTS OHANA MILITARY COMMUNITIES, LLC AND FOREST CITY RESIDENTIAL MANAGEMENT, LLC'S REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE RE VIOLATIONS OF THE PARTIES' SETTLEMENT AGREEMENT; CERTIFICATE OF COMPLIANCE; DECLARATION OF COUNSEL; EXHIBITS 1-5; CERTIFICATE** |

5937902.1

**OF SERVICE**

DATE:    July 25, 2016
TIME:    10:30 a.m.
JUDGE:   Hon. Helen Gillmor

TRIAL:    Case Terminated

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................ 1

II.  THE ONLY SUBSTANTIVE DOCUMENT SUBMITTED BY
     MS. BARBER STATES THERE  IS "NO EVIDENCE" OF ANY
     PESTICIDE ISSUES AT MCBH ................................................ 2

III. MS. BARBER HAS MISSTATED THE LAW APPLICABLE TO
     THIS MOTION ........................................................................... 4

IV.  THE BREACHES OF THE SETTLEMENT AGREEMENT ..................... 7

     A.   Ms. Barber's False and Defamatory Statements in Violation of
          Paragraph 7 ......................................................................... 8

          1.   Ms. Barber's Assertion that "Contamination Levels" at
               MCBH "Remain at Least 20 Times Higher Than EPA
               Safety Recommendations" ........................................... 8

          2.   Ms. Barber's Claim that Defendants Refused to Remove
               "18 Inches of Highly Contaminated Topsoil" From
               Around the Homes ..................................................... 10

          3.   Ms. Barber's Description of the Dangers Posed by the
               OCPs ........................................................................ 11

     B.   Ms. Barber's Violation of the Confidentiality Provision in
          Paragraph 4 ....................................................................... 12

          1.   Ms. Barber's Contention that Defendants Refused to
               Perform Testing .......................................................... 12

          2.   Ms. Barber's Statements Implying That All MCBH
               Residents Are Entitled to Significant Settlement
               Amounts .................................................................... 14

     C.   Ms. Barber's Participation in New Lawsuits ...................................... 17

V.   THE RELIEF SOUGHT BY DEFENDANTS ........................................... 17

VI.  CONCLUSION ......................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. United States,*
  612 F.2d 1112 (9th Cir. 1979).................................................................... 5

*Clarke v. First Transit, Inc.,*
  Case No. CV 07-06476 GAF, 2012 U.S. Dist. LEXIS 191169 (C.D. Cal.
  Nov. 21, 2012)...................................................................................... 19

*Huynh v. City of Worcester,*
  No. 08-40240-TSH, 2010 U.S. Dist. LEXIS 84140 (D. Mass. Aug. 17,
  2010)................................................................................................... 7

*McDermott ex rel. NLRB v. Amersand Publ'g, LLC,*
  593 F.3d 950, 957-63 (9th Cir. 2010) ...................................................... 6

*Medi-Weightloss Franchising USA, LLC v. Sadek,*
  No. 8:09-cv-2421-T-24-MAP, 2010 U.S. Dist. LEXIS 42266 (M.D. Fla.
  Apr. 29, 2010) ..................................................................................... 7

*Overstreet v. United Brotherhood of Carpenters and Joiners,*
  409 F.3d 1199, 1207 (9th Cir. 2005)....................................................... 6, 7

*Saini v. Int'l Game Tech.,*
  434 F. Supp. 2d 913 (D. Nev. 2006) ........................................................ 7

*San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters,*
  125 F.3d 1230 (9th Cir. Cal. 1997) ......................................................... 6

*Schrier v. Univ. of Colo.,*
  427 F.3d 1253 (10th Cir. 2005).............................................................. 5

*Stanley v. USC,*
  13 F.3d 1313 (9th Cir. 1994)................................................................. 5

*United States v. Stevens,*
  559 U.S. 460 (2010) ........................................................................... 6

## I.    INTRODUCTION

Cara Barber's violations of the Settlement Agreement are causing substantial, irreparable harm to Defendants.  Since the initial filing of this Motion on June 6, 2016, Defendants have received new claims from 101 current and former residents of Marine Corps Base Hawaiʻi ("MCBH").  Each resident has submitted an identical mediation demand that provides no information about the nature of resident's actual claim.  *See, e.g.*, Whattoff Decl., Ex. 1.  There is no question these claims are the result of the new smear campaign launched by Ms. Barber and her attorneys.[1]  Among other things, the first claims were received on June 6, 2016, approximately a month after the campaign began; every single one of the claimants is represented by the attorneys that Ms. Barber is instructing her followers to contact; and many of the new claimants can be directly connected to Ms. Barber.  For instance, a review of Ms. Barber's Facebook page reveals that, *at a minimum*, 22 of the new claimants are followers of Ms. Barber who *actively engage* with her posts on social media.

The other requirement for a preliminary injunction—likelihood of success on the merits—is demonstrated by Ms. Barber's Opposition, which makes

---

[1] If there was any doubt regarding whether Ms. Barber was working directly with her attorneys, the extent of their coordination was demonstrated by a recent post where Ms. Barber informed her 1,860 Facebook followers regarding the specific dates that one of her attorneys would be travelling, and posted a large image with alternative contact information.  *See* Whattoff Decl., Ex. 2.

clear that Ms. Barber has no evidence to support her claims.  Indeed, the <u>only</u> document submitted by Ms. Barber in support of her allegations is a letter from Linda Rosen, M.D., the former Director of the Hawai'i Department of Health ("HDOH"), reiterating that "*we have no evidence* that residual pesticides are present in surface soils at unacceptable levels *anywhere* in MCBH housing neighborhoods."  Opp., Ex. 2 at 1 (emphasis added).

Defendants' motion should be granted.  Defendants are not seeking a mandatory injunction that would bar future speech.  Nor are Defendants seeking an injunction that would require Ms. Barber to remove the scores of posts she made prior to entering into the Settlement Agreement.  Defendants seek a limited injunction requiring the removal of the posts that Ms. Barber made during an approximately two-month period because they directly violate the Settlement Agreement.  Defendants further request the Court issue an Order to Show Cause so that Ms. Barber can be questioned regarding her conduct, and a determination can be made regarding appropriate sanctions.

## II.   THE <u>ONLY</u> SUBSTANTIVE DOCUMENT SUBMITTED BY MS. BARBER STATES THERE  IS "NO EVIDENCE" OF ANY PESTICIDE ISSUES AT MCBH

Although Ms. Barber's Opposition makes numerous vehement statements about the condition of the soils at MCBH, the only *evidence* she submits in support of her allegations is a letter from HDOH Director Dr. Rosen,

which explicitly states that HDOH does *not* have any evidence of pesticide issues

at MCBH.  *See* Opp., Ex. 2.  As Dr. Rosen explains:

> The goal of OMC's Pesticide Soils Management Plan is to protect OMC residents' health and the local environment by preventing public exposure to PI [pesticide-impacted] soils.  The Plan's primary means of achieving this goal is to require that all PI soils located in exposed-soil areas (areas not surfaced with asphalt or concrete) must be covered by a layer of clean fill.

> At MCBH, this layer is at least 24 inches thick.  . . .

> On 3/21/2014 we requested from OMC all available information on implementation of their Pesticide Soils Management Plan.  OMC responded on 4/17/2014.  *OMC's response includes extensive documentation showing areas where, as specified in their Plan, OMC had placed protective clean fill layers on top of PI soils encountered during construction.*  Note that OMC did not seek HDOH approval of their implementation of the Plan and did not provide updates or information on construction activities until our 3/21/2014 request.  Post-construction sampling of surface soils in completed neighborhoods was not included in the Plan *or required by HDOH.*  As a result, no sampling data is available to support the effectiveness of OMC's actions; *on the other hand, we have no evidence that OMC's actions were not effective or that pesticides are present in surface soils at unacceptable levels in OMC housing neighborhoods.*

*Id.* at 2 (emphasis added).

This letter illuminates Ms. Barber's true position, which is often

obscured by her extreme assertions.  Ms. Barber's theory is that, because there has

not been post-construction testing to confirm that clean soils were *really* used to

replace the potentially pesticide-impacted soils, there might, *in theory*, still be pesticides present at MCBH.  The fundamental problem with this theory—apart from the fact it is wrong—is that the statements in Ms. Barber's numerous posts and communications go far beyond this failure-to-confirm theory.  Ms. Barber's posts do not state that there *might* still be pesticides around the homes at MCBH *if* Defendants did not really perform remediation.  As discussed at length below, Ms. Barber affirmatively states that there *are* currently pesticides that present a serious risk to residents.  As Ms. Barber's own documents make clear, she has no evidence to support this position.

## III.   MS. BARBER HAS MISSTATED THE LAW APPLICABLE TO THIS MOTION

Ms. Barber claims this Motion should be held to a higher legal standard because (1) it seeks a mandatory, rather than prohibitive injunction; and (2) it implicates speech.  *See* Opp. at 7-10.  Both of these arguments should be quickly rejected.

*First*, Ms. Barber contends that this Motion seeks a mandatory injunction because it would require her to remove her post-settlement posts, which she characterizes as an affirmative act.  But as even the cases cited by Ms. Barber make clear, determining whether an injunction is mandatory or prohibitive is not nearly so simple.

> Indeed, the distinction between mandatory and
> prohibitory injunctions cannot be drawn simply by
> reference to whether or not the *status quo* is to be
> maintained or upset. . . . *In many instances, this
> distinction is more semantical than substantive.*

*Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005) (emphasis added).

The test for whether the Court will "characterize an injunction as mandatory [is] if

'the requested relief affirmatively requires the nonmovant to act in a particular

way, *and as a result places the issuing court in a position where it may have to

provide ongoing supervision to assure the nonmovant is abiding by the

injunction.*'" 427 F.3d at 1261 (emphasis added).

The cases cited by Ms. Barber enumerate the types of situations that

meet this test.  For instance, an injunction that requires a university to appoint a

specific individual as Chair of the Department of Medicine is mandatory because

"reinstatement would place the court in position where it may have to provide

supervision." *Id.*  All of the cases cited by Ms. Barber involve similarly ongoing

conduct.  *See, e.g., Stanley v. USC,* 13 F.3d 1313, 1320 (9th Cir. 1994) (injunction

would have required specific individual to be hired as university's head basketball

coach); *Anderson v. United States,* 612 F.2d 1112, 1114-15 (9th Cir. 1979)

(injunction would have required hiring of specific individual).

The injunctive relief sought here will *not* require the Court to engage

in ongoing supervision.  Defendant has moved the Court for an order that will

require Ms. Barber to remove certain clearly defined social media posts that she made over a fixed period of time. This should take her a few minutes to complete, and will not require any ongoing monitoring. Once the posts are removed, there is nothing further for Ms. Barber or the Court to do.

*Second*, Ms. Barber cites two cases decided under the National Labor Relations Act ("NLRA") to support her argument that a "heightened equitable standard" is required here under the First Amendment. *See* Opp. at 8-9. Neither of these cases is as broad as Ms. Barber asserts. In *Overstreet v. United Brotherhood of Carpenters and Joiners*, the Court merely held that when deciding a preliminary injunction on appeal that implicates the First Amendment, the ordinary principles of deference to the Board's interpretation of the NLRA did not apply. 409 F.3d 1199, 1207 (9th Cir. 2005). Similarly, in *McDermott ex rel. NLRB v. Amersand Publ'g, LLC*, the court reviewed the district court's denial of injunctive relief under the NRLA and used the standard set in *Overstreet*. 593 F.3d 950, 957-63 (9th Cir. 2010).

Ms. Barber's reliance on these NRLA cases is misguided. Courts have long recognized that certain "well-defined and narrowly limited classes of speech—*e.g.*, obscenity, defamation, fraud, incitement—are categorically "outside the reach" of the First Amendment. *United States v. Stevens*, 559 U.S. 460, 468-69 (2010); *see also San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*,

125 F.3d 1230, 1239 (9th Cir. Cal. 1997) (upholding preliminary injunction against protestors; "The First Amendment does not protect fraud."). Similarly, courts have held that there is no First Amendment issue where there is a confidentiality agreement. *See, e.g., Huynh v. City of Worcester*, No. 08-40240-TSH, 2010 U.S. Dist. LEXIS 84140, at *8 (D. Mass. Aug. 17, 2010). As a result, courts have regularly granted preliminary injunctions where, as here, a breach of a confidentiality or similar agreement has been alleged.[2]

Finally, it should be noted that Defendants are not seeking a prior restraint on Ms. Barber's speech, since the speech at issue has already occurred. *See Overstreet*, 409 F.3d at 1218 (discussing that an unconstitutional prior restraint is where an injunction is issued *before* a determination can be made that the speech is unprotected by the First Amendment).

## IV.   THE BREACHES OF THE SETTLEMENT AGREEMENT

Because of the extent of Ms. Barber's online activities, it is difficult to summarize all of the ways in which she has breached the Settlement Agreement. The following are Ms. Barber's most significant breaches.

---

[2] *See, e.g., Medi-Weightloss Franchising USA, LLC v. Sadek*, No. 8:09-cv-2421-T-24-MAP, 2010 U.S. Dist. LEXIS 42266 (M.D. Fla. Apr. 29, 2010); *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913 (D. Nev. 2006).

A.     **Ms. Barber's False and Defamatory Statements in Violation of Paragraph 7**

1.     Ms. Barber's Assertion that "Contamination Levels" at MCBH "Remain at Least 20 Times Higher Than EPA Safety Recommendations"

In Ms. Barber's blog entries she repeatedly claims that Defendants "*know* contamination levels in MCBH and Pearl Harbor neighborhoods *remain* at least *20 times higher* than EPA safety recommendations, exposing residents, their children and pets to much higher lifetime rates of cancer and other diseases." Mot. Ex. S at 29 (emphasis added); *see also id.* at 33, 34. She claims that this is true *even if* Defendants followed the PSMP:

> IF we **assume** . . . that planned remediation in these neighborhoods was effectively completed, then **contamination levels are still around 20 times higher than EPA safety recommendations! That's per FC/OMC's own *PLAN*,** as they never seriously considered removing or remediating ALL the contamination.

*Id.* at 12-16 (emphases original). As discussed in Defendants' Motion, these claims are false. In the neighborhoods redeveloped by Defendants, the soil from around all homes was removed and replaced (or covered), regardless of whether it tested positive for pesticides. *See* Mot. at 15. In her Opposition, Ms. Barber contends her statements were nevertheless true because "no testing establishes that OMC's remediation efforts were effective. Stated differently, while OMC claims

8

that it has remediated soils at MCBH, no actual testing supports its claim." Opp. at 15.

But this justification would only make sense if Ms. Barber had said something like: "Despite the closure reports documenting the removal of the old soil, *it is possible* that soils could still be 20 times higher than EPA safety recommendations if those closure reports were not correct." This is not what Ms. Barber wrote. Instead, she states that Defendants "*know* contamination levels in MCBH and Pearl Harbor neighborhoods *remain* at least *20 times higher* than EPA safety recommendations." Ms. Barber further states that *even if the plan was followed*, "contamination levels are still around 20 times higher than EPA safety recommendations!" This false. If the PSMP was followed—as all evidence indicates it was—then contaminations levels around homes are zero.

Ms. Barber also contends that "OMC's reliance upon the self-serving declaration of Dennis Poma is no different than Cara Barber relying upon her own observations of improper practices during the alleged remediation." Opp. at 15-16. This comparison is ridiculous. Mr. Poma "is a senior consultant and civil engineer with 23 years of experience leading key projects." Mr. Poma's company, ASCI, performed extensive work at MCBH, including overseeing soil excavation and coordinating the screening of neighborhoods for pesticides. *See id.*, ¶ 7. Mr. Poma's statements about the removal of soils at MCBH are supported by

detailed records and closure reports, which track each of the buildings that was demolished, when the soil was removed from around and underneath each building, how much soil was removed, and where that soil was placed. *See* Mot., Ex. T at DEFS189-196, Ex. U at DEFS210-226, Ex. V at DEFS325-326. Ms. Barber, on the other hand, baldly asserts—with no supporting documentation—that she "saw no evidence that contaminated soils were removed." Opp., Barber Decl., ¶ 5. This is not even supported by *Ms. Barber's own deposition testimony*, where she agreed that Defendants had removed and replaced soil, but claimed her recollection was that it was "approximately six inches." *See* Ex., 5 at 104:17-106:16.[3]

> 2.   Ms. Barber's Claim that Defendants Refused to Remove "18 Inches of Highly Contaminated Topsoil" From Around the Homes

In Ms. Barber's blog entries, she repeatedly claims that Defendants refused to undertake the "incredibly costly proposition of having to remove 18 inches of highly contaminated topsoil from hundreds of acres of MCBH and PH neighborhoods and subsequently replacing it with 'clean fill' before they could begin building earning rental income from the thousands of homes they had planned . . . ." Mot., Ex. S at 21; *see also id.* at 10, 33. As discussed above and in

---

[3] Ms. Barber admitted that even this claim was based on her casual observations of her neighbor's homes (that she attempted to recollect years later), and her review of certain unidentified photographs. *See id.*

the Motion, this is not true for the neighborhoods built by Ohana. In her

Opposition, Ms. Barber contends that what she really meant "is that contaminated

soils were not removed *from MCBH*. Instead, they were simply buried in pits

below existing homes without notice to residents." Opp. at 16 (emphasis added).

In other words, Ms. Barber contends that she was not really stating that Ohana

refused to undertake the "incredibly costly proposition of having to remove 18

inches of highly contaminated topsoil from hundreds of acres of MCBH and PH

neighborhoods and subsequently replacing it with 'clean fill'"; she was saying that

Ohana did this, but after Ohana removed the soil, it declined to dispose of it off-

site. This characterization is nothing more than an attempt to re-write Ms. Barber's

blog entries after the fact. Ms. Barber's statements speak for themselves, and it is

clear that she is claiming that Ohana refused to remove soils from around and

underneath homes—not that Ohana declined to dispose of the soils off-site. *See*

Mot., Ex. S at 10, 21, 33. Indeed, none of the instances where Ms. Barber discuss

Ohana's alleged refusal even mention off-site burial.

3.     Ms. Barber's Description of the Dangers Posed by the OCPs

In Ms. Barber's posts, she describes organo-chlorinated pesticides

("OCPs") as "some of the most toxic and persistent chemicals known to

man. Results confirmed these extremely hazardous chemicals and carcinogens

were present in neighborhood soils at levels that pose *serious health and exposure*

*risks* to resident families." Mot., Ex. S at 10 (emphasis added).  As discussed in

our Motion, however, these pesticides are ubiquitous throughout Oahu, and HDOH

has stated:  "We are not aware of any documented cases of health effects due to

exposure at the low levels associated with organochlorine pesticide residues in

soil."  Mot., Ex. X.  There are no "serious health and exposure risks to resident

families."

>       In her Opposition, Ms. Barber contends that Defendants' position is

nothing more than a disagreement about how Ms. Barber "has characterized the

organo-chlorinated pesticides at issue" and there is "no dispute that these

chemicals are extremely dangerous."  *Id.*  But the issue is not whether OCPs can be

dangerous in the abstract.  As HDOH has made clear, the pesticides can be

dangerous for individuals with "high-level exposure, such as during pesticide

application, or due to intentional or accidental poisoning."  Mot., Ex. X.  The issue

is whether, as Ms. Barber states, the OCPs at MCBH presented a "serious health

and exposure risks to resident families."  There is no evidence this was the case.

>       **B.      Ms. Barber's Violation of the Confidentiality Provision in
>               Paragraph 4**

>>      1.      Ms. Barber's Contention that Defendants Refused to Perform
>>              Testing

>       In numerous of Ms. Barber's blog posts and in her YouTube video,

Ms. Barber claims that Defendants "refused numerous requests" to perform

confirmation testing.  Ms. Barber attempts to justify these comments in her

Opposition, arguing that her "comments stating that OMC has refused to conduct

post-remediation testing has nothing to do with disclosure of any term under the

Settlement Agreement" and that Defendant's purpose in raising this issue was a

"transparent effort to disparage Mrs. Barber before this Court."  Opp. at 20.





In fact, Defendants are continuing to discuss a plan for confirmation testing with HDOH. *See* Whattoff Decl., ¶ 10. Defendants are currently working on a final proposal to submit for HDOH. *See id.* There has not been any "refusal" to conduct testing.

      2.    <u>Ms. Barber's Statements Implying That All MCBH Residents Are Entitled to Significant Settlement Amounts</u>

Ms. Barber also notified her more than 1,000 Facebook followers that

Mot., Ex. II.   As

discussed in the motion, this is a very damaging statement because it clearly

conveys ███████████████████████████████████████████

██████████. Ms. Barber claims that her statement is no different than a

question and answer on Defendants' website that states:

> 3. What is the status of the lawsuit?
>
> On November 20, 2015, a judge entered findings and recommendations to deny the plaintiff's motion to certify the lawsuit as "class action." In February 2016, the parties entered into a settlement agreement and the case was dismissed.

Ms. Barber contends this statement is improper because (1) the sentence preceding

the reference to the settlement agreement mentions Judge Chang's findings and

recommendations; and (2) the second sentence states that the "parties entered into

a settlement agreement" rather than the parties "reached a mutually agreed upon

Settlement." There is absolutely nothing improper about the first sentence—the

question posed is "What is the status of the lawsuit?" and Judge Chang's Finding

and Recommendations were the last thing to occur before the dismissal. With

regard to the second sentence, Ms. Barber has not even suggested how she has

been harmed by the use of the phrase "the parties entered into a settlement

agreement" rather than "the parties reached a mutually agreed upon Settlement."

What makes Ms. Barber's statement so dangerous was the context in

which it was made. On her Facebook page and her blog, Ms. Barber repeatedly

encourages residents to contact her attorneys to file lawsuits against Defendants,

and she make statements like "MANY MCBH families are pursuing accountability

and justice, which can include reimbursement of all BAH/rents paid," which for

many residents could exceed $100,000.  Or, as Ms. Barber stated in another post

filed the same day as this motion:

> EVERY military family who leased a MCBH or Pearl
> Harbor home from Forest City has the right to pursue
> accountability and justice for their family.  Forest City
> deceived us all and exposed all of our children and
> families to completely unnecessary and unacceptable
> health risks without warning or notification.  All who DO
> NOT HAVE HEALTH EFFECTS have the same rights
> to pursue the SAME legal claims we did, enabling you to
> pursue accountability and justice for YOUR FAMILY
> too.

Whattoff Decl., Ex. 3.  The post was accompanied by a large image with red,

white, and blue letters stating "NO ONE IN YOUR FAMILY HAS TO HAVE

HEALTH EFFECTS TO PURSUE LEGAL CLAIMS." *Id*.  This message is

having the desired effect on Ms. Barber's audience—*i.e.*, convincing them a large

payout is just a claim away.  As one recent commenter encouraged Ms. Barber's

more than 1,000 followers:

> Contact Christina Lambe at Lynch Harper Smith LLP
> 808-791-9558.  They're the law firm that handled the
> original case of the 2 girls *that won against FC*.  But the
> judge didn't rule it as a class action lawsuit so not
> everyone that was involved indirectly (the residents of
> MCBH) got any benefits from the settlement.

Whattoff Decl., Ex. 4 (emphasis added).  Clearly, Ms. Barber's message ▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉is getting through.

### C.   Ms. Barber's Participation in New Lawsuits

Paragraph 6 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  During the process

of negotiating the Settlement Agreement, Plaintiffs made clear that they sought to

reserve their right to speak to residents and to state agencies if they believed that

Defendants were not taking action regarding perceived soil issues.  Defendants

agreed to this concession, and modified Paragraph 6 accordingly.  But

Ms. Barber's conduct has now moved well outside of the realm of speech and into

active litigation.  Ms. Barber is *recruiting* new plaintiffs and acting as a *surrogate*

and *broker* for her former attorneys for the same claims released by the Settlement

Agreement.  This conduct crosses the line from speech into active participation in

her released claims, and it is a violation of the Settlement Agreement.

## V.   THE RELIEF SOUGHT BY DEFENDANTS

Ms. Barber takes substantial issue with the fact that Defendants

proposed, as a way to resolve this dispute, that her counsel withdraw as counsel for

the 101 residents who have submitted mediation demands as a result of Ms.

Barber's and her attorneys' smear campaign.  Ms. Barber notes that such a

proposal is potentially not permitted under HRPC 5.6, and suggests that

Defendants' proposal demonstrates that the Motion itself was brought for a

"wholly improper purpose." Opp. at 2.

Defendants made the proposal because it was the only way that

Defendants could envision remedying the massive harm caused by Ms. Barber's

and her attorney's conduct. As discussed at length in Defendants' Motion,

Ms. Barber's new campaign was coordinated with her former attorneys in an

attempt to solicit clients using means that would otherwise violate the HRPC. In

particular, the purpose of the campaign appears to have been to spread false

information and fear related to MCBH housing in an attempt to drive new clients

to Ms. Barber's former attorneys. It also appears to have been a way to channel

attorney solicitations directly to individuals who are connected to Ms. Barber

though social media and other outlets.

As the events since the filing of this Motion have made clear:

*Ms. Barber's and her attorneys' campaign worked.* Since this Motion was filed,

Defendants have received 101 mediation demands. Whattoff Decl., Ex. 1.

Tellingly, none of these mediation demands contain any specific information about

the resident's claims—they are simply carbon copies of each other. There can be

little doubt that these demands were the result of Ms. Barber's conduct. For

instance, *at a minimum*, 22 of the new claimants are followers of Ms. Barber who

*actively engage* with her posts on social media.  Whattoff Decl., ¶¶ 3-7.  This is likely just a small fraction of the claimants who have read Ms. Barber's posts.  *See id.*  Moreover, Defendants had not received any similar mediation claims prior to Ms. Barber's social media campaign; *all claims were received after her campaign began in earnest.*  Indeed, Defendants are not presently aware of *any* mediation demands related to MCBH housing that were pending prior to Ms. Barber's campaign.

After Ms. Barber's counsel pointed out the issue with HRPC Rule 5.6, Defendants withdrew their proposal.  But that does not mean that this is not the appropriate way to ultimately remedy the misconduct of Ms. Barber and her attorneys.  The only way to undo the harm caused by Ms. Barber and her attorneys is through the disqualification of Ms. Barber's current attorneys from representing these residents.  This is a standard remedy in instances of improper solicitation. *See, e.g., Clarke v. First Transit, Inc.*, Case No. CV 07-06476 GAF (JCGx), 2012 U.S. Dist. LEXIS 191169 (C.D. Cal. Nov. 21, 2012).  Defendants did not seek disqualification in the instant Motion because, at the time the motion was initially filed, Defendants had not received the new mediation demands (they were received on the same day, June 6, 2016).  However, in addition to the preliminary injunction, Defendants have moved for an Order to Show Cause hearing where

appropriate sanctions will be set.  Given the current facts, disqualification of

Ms. Barber's attorneys is appropriate.

## VI.   CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court

grant this Motion.

DATED:  Honolulu, Hawaiʻi, July 20, 2016.

/s/ Randall C. Whattoff
LISA WOODS MUNGER
RANDALL C. WHATTOFF
CHRISTINE A. TERADA

Attorneys for Defendants
OHANA MILITARY COMMUNITIES, LLC
FOREST CITY RESIDENTIAL
MANAGEMENT, LLC