COX FRICKE LLP
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOACHIM P. COX             7520-0
   jcox@cfhawaii.com
RANDALL C. WHATTOFF        9487-0
   rwhattoff@cfhawaii.com
KAMALA S. HAAKE            9515-0
   khaake@cfhawaii.com
800 Bethel Street, Suite 600
Honolulu, Hawai'i  96813
Telephone:  (808) 585-9440
Facsimile:   (808) 275-3276

GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

LISA WOODS MUNGER         3858-0
   lmunger@goodsill.com
CHRISTINE A. TERADA       10004-0
   cterada@goodsill.com
First Hawaiian Center, Suite 1600
999 Bishop Street
Honolulu, Hawai'i  96813
Telephone:  (808) 547-5600
Facsimile:   (808) 547-5880

Attorneys for Defendants
OHANA MILITARY COMMUNITIES, LLC
FOREST CITY RESIDENTIAL MANAGEMENT, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| PLAINTIFFS CARA BARBER, MELISSA JONES, MELISSA STREETER, KATIE ECKROTH, BOB BARBER, TIM JONES, AND RYAN | CIVIL NO. 14-00217 HG-KSC<br><br>DEFENDANTS OHANA MILITARY COMMUNITIES, LLC |

ECKROTH, On Behalf of Themselves and All Others Similarly Situated,

Class Plaintiffs,

vs.

OHANA MILITARY COMMUNITIES, LLC, FOREST CITY RESIDENTIAL MANAGEMENT, INC.; and DOE Defendants 1-10,

Defendants.

AND FOREST CITY RESIDENTIAL MANAGEMENT, LLC'S MEMORANDUM IN OPPOSITION TO PLAINTIFF CARA BARBER'S MOTION TO DISMISS DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE RE VIOLATIONS OF THE PARTIES' SETTLEMENT AGREEMENT; CERTIFICATE OF COMPLIANCE; DECLARATION OF RANDALL C. WHATTOFF; EXHIBITS A-I; PRELIMINARY INJUNCTION HEARING EXHIBITS 6-13, Q; CERTIFICATE OF SERVICE

# TABLE OF CONTENTS

**Page No.**

I.  INTRODUCTION ................................................................................. 1

II. FACTUAL AND PROCEDURAL BACKGROUND ........................... 4

    A. The Settlement Agreement ................................................. 4

    B. The Solicitation Campaign ................................................. 5

        1.  Blog ...................................................................... 5

        2.  Facebook ............................................................. 8

        3.  New Website ....................................................... 9

        4.  YouTube .............................................................. 10

    C. The Preliminary Injunction Motion .................................... 10

    D. The District Court's Order and the Subsequent Appeal .................. 12

    E. The Second Appeal and *Barber II* ...................................... 13

III. ARGUMENT ................................................................................. 15

    A. Ms. Barber's Social Media Campaign Has Caused Irreparable
       Harm to Defendants .......................................................... 15

        1.  Under Hawai'i Law, There Is a Presumption That Ms. Barber's
           Statements Constitute Irreparable Harm ........................ 16

        2.  The Statements Themselves—Including their Content,
           Audience, and Frequency—Plainly Demonstrate a Likelihood
           of Irreparable Harm ...................................................... 19

        3.  This Is the Rare Case Where There Is Direct Evidence of
           Reputational Harm ....................................................... 21

    B. The Cases Cited by Ms. Barber Do Not Support Her Contention
       That Injunctive and Monetary Relief Are Mutually Exclusive ......... 24

C.  There Is Nothing Inconsistent or Improper About Seeking Injunctive Relief In This Action and Damages in *Barber II*............ 27

    1.  *Barber II* Was Necessitated by the Unique Procedural Posture of This Case and the Court's Limited Jurisdiction...................... 27

    2.  Courts Regularly Award Damages and Injunctive Relief for the Same Underlying Conduct ...................................................... 29

D.  Ms. Barber Has Misrepresented the Hearing on the Motion to Dismiss in *Barber II* .......................................................... 33

E.  Judicial Estoppel Is Wholly Inapplicable ......................................... 36

IV.  CONCLUSION ...................................................................... 38

# TABLE OF AUTHORITIES

**Page No.**

## CASES

*Air Terminal Services, Inc. v. Lehigh-Northampton Airport Auth.*,
  No. CIV. A. 96-2314, 1996 WL 460059 (E.D. Pa. Aug. 1, 1996) .........34, 35

*Airgo, Inc. v. Horizon Cargo Transp., Inc.*,
  66 Haw. 590, 593, 670 P.2d 1277, 1280 (1983) .....................................31

*American Promotional Events, Inc. v. City & County of Honolulu*,
  796 F.Supp.2d 1261 (D. Haw. 2011).......................................................24, 25

*Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*,
  No. 06-CV-1584 H (POR), 2009 WL 10674087
  (S.D. Cal. May 12, 2009)...........................................................................32

*Burmeister v. County of Kaua'i*,
  No. CV 16-00402 LEK-KJM, 2018 WL 2392499
  (D. Haw. May 25, 2018) ............................................................................36

*Church & Dwight Co., Inc. v. Clorox Co.*,
  840 F.Supp.2d 717 (S.D.N.Y. 2012) ......................................................19

*Colorado River Indian Tribes v. Town of Parker*,
  776 F.2d 846 (9th Cir. 1985) ..................................................................26

*Goldie's Bookstore, Inc. v. Sup. Ct. of State of Cal.*,
  739 F.2d 466 (9th Cir. 1984) ..................................................................26

*Hi-Tech Rockfall Constr., Inc. v. County of Maui*,
  No. CV08-00081DAE-LEK, 2008 WL 659789
  (D. Haw. Mar. 11, 2008)............................................................................26

*I.H.T. Corp. v. News World Communications, Inc.*,
  No. 83 CIV. 3862-CSH, 1984 WL 604 (S.D.N.Y. July 3, 1984)...........35

*Ito v. Inv'rs Equity Life Holding Co.*,
  135 Hawai'i 49, 346 P.3d 118 (2015)........................................................36

*Kahanamoku v. Advertiser Pub. Co.*,
   25 Haw. 701 (1920) ............................................................... 16

*Lamonds v. Gen. Motors Corp.*,
   34 F.Supp.2d 391 (W.D. Va. 1999) ...................................... 36

*Matter of Hallahan*,
   936 F.2d 1496 (7th Cir. 1991) ....................................... 29, 30

*Mohamed v. Jeppesen Dataplan, Inc.*,
   614 F.3d 1070 (9th Cir. 2010) .............................................. 11

*Murphy v. Maui Pub. Co.*,
   23 Haw. 804 (1917) ............................................................... 16

*MySpace, Inc. v. Wallace*,
   498 F. Supp. 2d 1293 (C.D. Cal. 2007) ............................... 15

*Osmose, Inc. v. Viance, LLC*,
   612 F.3d 1298 (11th Cir. 2010) ............................................ 19

*Partington v. Bugliosi*,
   825 F. Supp. 906 (D. Haw. 1993) ........................................ 17

*Pelosi v. Wailea Ranch Estates*,
   91 Hawai'i 478, 985 P.2d 1045 (1999) ................................ 31

*Pinnacle Healthcare, LLC v. Sheets*,
   17 N.E.3d 947 (Ind. Ct. App. 2014) .................................... 32

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) ............................................... 15

*Roxas v. Marcos*,
   89 Hawai'i 91, 969 P.2d 1209 (1998) ............................. 36, 37

*Russell v. Am. Guild of Variety Artists*,
   53 Haw. 456, 497 P.2d 40 (1972) ........................................ 17

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) .................................................................. 15

*Teutscher v. Woodson*,
   835 F.3d 936 (9th Cir. 2016) .................................................................. 32

*TMRJ Holdings, Inc. v. Inhance Techs., LLC*,
   540 S.W.3d 202 (Tex. App. 2018) ......................................................... 32

*Vecoplan LLC v. Ameri-Shred Corp.*,
   335 F. Supp. 2d 657 (M.D.N.C. 2004) ............................................. 19, 20

**STATUTES**

Haw. Rev. Stat. § 657-4 ............................................................................ 27

**DEFENDANTS OHANA MILITARY COMMUNITIES, LLC AND FOREST CITY RESIDENTIAL MANAGEMENT, LLC'S MEMORANDUM IN OPPOSITION TO PLAINTIFF CARA BARBER'S MOTION TO DISMISS**

## I.   INTRODUCTION

Plaintiff Cara Barber's entire motion is premised on a clear mistake of law:  her contention that a party cannot simultaneously seek injunctive and monetary relief.  Indeed, Ms. Barber baldly asserts that "[b]lackletter law confirms that a party cannot seek a preliminary injunction in one court claiming irreparable harm while simultaneously pursuing damages in a second court for the same conduct."  Memo. at 1.  "Blackletter law" confirms no such thing.  To the contrary, parties <u>regularly</u> seek injunctive relief and damages based on the same underlying conduct.  This should be no surprise to Ms. Barber and her counsel, as they sought both forms of relief in Ms. Barber's "Second Amended Class Action Complaint for <u>Damages & Injunctive Relief</u>."  Indeed, Ms. Barber sought "[g]eneral, special, treble, and consequential damages," <u>and</u> "[p]reliminary and permanent injunctive relief to require Defendants to" investigate purported "chemical contamination," provide warnings to "past and present tenants," and "[e]njoin Defendants' lease of <u>any residential property.</u>"  Sec. Am. Class Action Compl. for Damages & Inj. Relief at 34–35 (Dkt. 76).

Unsurprisingly, Ms. Barber cites no case law holding that a party may not maintain simultaneous actions for injunctive and monetary relief.  Rather, she

focuses on cases generally discussing the standard for establishing irreparable harm, and relies upon the general rule that economic injury <u>alone</u> is usually not enough to support injunctive relief.  Ms. Barber then leaps to the conclusion that a request for economic damages forecloses injunctive relief and the ability to prove irreparable harm.  This logical leap is directly contradicted by the case law.

Ms. Barber's conduct here plainly supports a finding of irreparable harm.  Shortly after the parties' settlement agreement was finalized, Ms. Barber and her attorneys launched an all-out smear campaign to recruit new clients to file new lawsuits against Defendants.  The effort was driven by Ms. Barber's social media efforts, which spanned numerous platforms including her blog, Facebook, and a newly launched standalone website.  Ms. Barber's statements on these platforms were wildly false and misleading.  Among the scores of false and disparaging statements, Ms. Barber claimed:

- Defendants failed to remove 18 inches of contaminated soil before building hundreds of homes at Marine Corps Base Hawaiʻi ("MCBH") because to do so would be too expensive;

- Defendants exposed MCBH residents to pesticide levels at least "20 times higher than EPA safety recommendations";

- Defendants exposed residents to "some of the most toxic . . . chemicals known to man";

- "[L]iving in these contaminated neighborhoods exposes residents, your children and pets to much higher lifetime rates of cancer and many other diseases"; and

- Defendants committed "multiple, flagrant violations of public health and environmental laws, rules, and regulations" and that "these violations have and continue to expose thousands of military children and families to significantly increased health risks."

Ms. Barber does not even attempt to explain how these statements—which must be deemed false for the purposes of a motion to dismiss—would not constitute irreparable harm.

The recent briefing before the Ninth Circuit is instructive. In the most recent appeal, Ms. Barber took the position that the first appeal established that Ms. Barber's statements in violation of the <u>non-disparagement</u> provision could not constitute irreparable harm. Defendants argued that the first appeal only addressed Ms. Barber's statements in violation of the <u>confidentiality</u> provision, and that there was substantial evidence that the statements in violation of the non-disparagement provision—which were much more extensive and egregious—caused irreparable harm. The evidence of irreparable harm included (1) Hawaiʻi law, which establishes a legal presumption of irreparable harm for statements like those made by Ms. Barber; (2) the content of the statement themselves, which, among other things, imputed criminal wrongdoing to Defendants; and (3) the direct evidence of harm established by the responses of Ms. Barber's followers on social media. The Ninth Circuit granted the appeal, implicitly finding that there was sufficient evidence of irreparable harm for the preliminary injunction motion to proceed.

There is no basis for Ms. Barber's newest Motion to Dismiss ("MTD").  It should be denied so that the parties can complete the testimony of the sole remaining witness, and this Court can then issue a decision on the merits of the preliminary injunction motion.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Settlement Agreement

In April 2014, Ms. Barber and three other current and former residents of MCBH filed this case claiming that Defendants failed to disclose the existence of unsafe levels of organ-chlorinated pesticides ("OCPs") in the soils around the homes at MCBH.  *See* Compl. (Dkt. 1-4).  The case was filed as a putative class action, but after a year and a half of litigation, the magistrate judge issued Findings and Recommendations to Deny Plaintiffs' Renewed Motion for Class Certification (Dkt. 253).  The parties thereafter participated in two settlement conferences, and the case was settled in February 2016.  *See* PI Ex. P (Dkt. 290).[1]  Under paragraph 4 of the settlement agreement, the parties agreed to a strict confidentiality provision.  *See id.*  Paragraph 6 prohibited Ms. Barber from

_____

[1] The exhibits used at the evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction and Order to Show Cause Re: Violations of the Parties' Settlement Agreement (Dkt. 278) ("PI Motion") are referred to herein as "PI Ex."  For the Court's convenience, the exhibits from the PI Motion hearing are being resubmitted herewith, except for the settlement agreement, which was sealed.

participating in future lawsuits.  *See id.*  And Paragraph 7 contained a non-

disparagement provision.  *See id.*

### B.     The Solicitation Campaign

Almost immediately after the settlement agreement was signed,

Ms. Barber and her attorneys began preparations for a new solicitation campaign to

drive clients to her attorneys and promote new lawsuits against Defendants.  *See*

Mot. to Disqualify Counsel and/or for Sanctions at 9–11, 13–16 ("DQ Motion")

(Dkt. 394).  The new solicitation campaign had two main components.  On the one

hand, the attorneys sent a solicitation letter to hundreds of individuals who had

submitted their information to Ms. Barber through a highly misleading

questionnaire.  *See* PI Ex. Q.  At the same time, Ms. Barber launched an all-out

smear campaign encouraging individuals to respond to the solicitation letter.

Ms. Barber's social media campaign included frequent posts across her various

social media platforms, virtually every one of which posts contained false and

disparaging statements about Defendants.

### 1.     Blog

On Ms. Barber's blog, she frequently drafted lengthy posts that

included charts, photographs, and diagrams.  *See* PI Ex. 6 at 1–78 (Dkt. 322).

According to the statistics displayed on the blog, Ms. Barber's blog had "1,583

followers" who "[g]et every new post delivered to [their] inbox."  *See* PI Ex. 6

at 78 (Dkt. 322).[2]  Furthermore, Ms. Barber admitted that the blog could be easily

found through Google searches and that Ms. Barber often linked to her blog posts

on her Facebook page.  *See* Ex. A at 14–15 (Dkt. 323); Ex. B 82–83 (Dkt. 327).

The blog entries contain so many false and disparaging statements that

it is impractical to catalog them all here.  As an example, on May 13, 2016,

Ms. Barber drafted a new blog entry titled "Is the soil still contaminated?  Has the

contamination been remediated?  What are current contamination levels?"  In that

single blog entry, Ms. Barber made the following false and disparaging statements:

- "[O]rganochlorine pesticides [are] some of the most toxic . . . chemicals known to man.  **Results confirmed these extremely hazardous chemicals and carcinogens were present in neighborhood soils at levels that pose serious health and exposure risks to resident families.**" PI Ex. 6 at 31 (Dkt. 322) (emphasis original).

- "To ensure new housing and neighborhoods developed were safe for military families, 18 inches of highly contaminated topsoil needed to be removed from these neighborhoods spanning hundreds of acres.  And all the soil removed had to be replaced with 'clean fill' before thousands of new homes could be built. Apparently, FC/OMC deemed this means of resolution to the contamination problem too costly and time consuming, as it would've cost tens of millions of dollars and likely caused significant project delays.  So FC/OMC proposed a different

---

[2] At the evidentiary hearing, Ms. Barber claimed that this number was incorrect and that she really only had "one follower," but she could provide no explanation for how the blog itself could list an incorrect number of followers.  Moreover, Ms. Barber's testimony was not credible, and we believe that the officially reported website statistics should control over Ms. Barber's self-serving assertion. As the blog's owner, Ms. Barber has complete access to the blog's statistics, but she failed to produce any evidence on these issues at the evidentiary hearing.

approach that could save them tens of millions of dollars and also enable them to begin earning more BAH/rental income much sooner." *Id.* at 31–32.

- "IF we **assume**, just as FC/OMC, MCBH, the Navy, NAVFAC, the Navy and Marine Corps Public Health Center and HDOH have, that planned remediation in these neighborhoods was effectively completed, then **contamination levels are still around 20 times higher than EPA safety recommendations!  That's per FC/OMC's own *PLAN***, as they never seriously considered removing or remediating ALL the contamination." *Id.* at 33 (emphasis original).

- "**When FC/OMC, MCBH, the Navy, Hunt and/or HDOH say, '*Remediation was completed and the homes and neighborhoods are safe*,'" they're really saying, '*All we know is remediation was supposedly attempted and, IF 100% EFFECTIVE, contamination levels should not be more than 20 times higher than EPA safety recommendations.***'" *Id.* at 33–34 (emphasis original).

- "**At best, current contamination levels in redeveloped neighborhoods are around 20 times higher than EPA safety recommendations.  At worst, contamination levels in any/all neighborhoods could be hundreds of times higher.**" *Id.* at 36 (emphasis original).

Numerous blog entries contained similar—and even worse—statements. *See, e.g.*, *Id.* at 14 (claiming, among other false and disparaging statements, that Ohana committed "multiple, flagrant violations of public health and environmental laws, rules, and regulations" and that "these violations have and continue to expose thousands of military children and families to significantly increased health risks . . . ."); *Id.* at 3–4 ("MCBH and Pearl Harbor residents are exposed to significantly increased health and exposure risks.  This includes much higher lifetime rates of

cancer and many other diseases including the following ADHD, Adverse Birth

Outcome, Autism, Autoimmune, Cancer, Developmental Delays, Endocrine &

Hormone, Liver & Kidney, Neurological, Reproductive, Respiratory.").  <u>All of</u>

<u>these statements are false</u>.

### 2. Facebook

Even before Ms. Barber began her current campaign in early May

2016, her "MCBH Housing Issues" Facebook page had more than 1,500 followers;

this number swelled to over 1,800 as the campaign progressed.  *See* Ex. D at 23

(Dkt. 338).  Moreover, the Facebook page is a public page that can be viewed by

anyone on the Internet.  *See id.* at 24.  At the time of the hearing, it was on the first

page of Google search results related to MCBH housing.  *See id.*

As part of the solicitation campaign, Ms. Barber frequently posted on

Facebook about what she called "some of the most hazardous chemicals known to

man."  PI Ex. 7 at 5 (Dkt. 325-2).  On a regular basis, Ms. Barber urged her

followers to file new lawsuits against Defendants and to retain her attorneys.  *See,*

*e.g.*, PI Ex. 8 at 1–2, 4–5 (Dkt. 325-3); PI Ex. 9 at 1, 12–13 (Dkt. 325-4); PI Ex. 10

at 1–3 (Dkt. 325-5); PI Ex. 11 at 1 (Dkt. 325-6); PI Ex. 12 at 1 (Dkt. 325-7); PI

Ex. 13 at 1 (Dkt. 325-8).  On her Facebook page, Ms. Barber repeated her claim

that Defendants failed to remove "18 inches of highly contaminated top soil"

because they "deemed this means of resolution of the contamination problem too

costly and time-consuming."  PI Ex. 9 at 2 (Dkt. 325-4); PI Ex. 10 at 11 (Dkt. 325-5); Ex. A at 46–47 (Dkt. 323).  Ms. Barber also repeated her claim that Defendants had exposed residents to levels that are at least 20 times greater that EPA safety recommendations.  *See* PI Ex. 10 at 8 (Dkt. 325-5) ("Evidence (testing, etc.) proves that at the VERY LEAST, contamination levels are 20 TIMES HIGHER THAN EPA SAFETY RECOMMENDATIONS!  There's no doubt about any of that."); *see also* PI Ex. 9 at 2, 9 (Dkt. 325-4); PI Ex. 10, at 12–13 (Dkt. 325-5).  Ms. Barber admitted that she made similar statements "numerous times" "throughout [her] blog and [her] Facebook."  Ex. A at 93–94 (Dkt. 323).  <u>Again, all of these statements are false</u>.  On her Facebook page, Ms. Barber even went so far as to accuse Defendants of criminal violations:  "Another idea Rebecca Leigh Johnson, might be to pressure the DA to pursue CRIMINAL CHARGES against them relative to all the laws, rules and regulations FC broke and Hunt continues to break."  PI Ex. 10 at 8 (Dkt. 325-5).

### 3.    New Website

As if her blog and Facebook posts were not enough, Ms. Barber created an entirely new, stand-alone website where she reposted and summarized her claims related to MCBH.  *See* Ex. A at 41–42 (Dkt. 323).  This website included the same claim that Defendants failed to remove 18-inches of soil from

underneath the homes, among other false and disparaging statements. *See id.* at 47-48.

### 4.   YouTube

Ms. Barber testified that she spent a "couple weeks" creating an hour-long video about her MCBH claims. *Id.* at 41. Like her other postings, the public YouTube video directed viewers to contact her attorneys. *See id.* at 38–40. The YouTube video contained many of the same false and defamatory statements as Ms. Barber's blog, Facebook page, and stand-alone website. *See id.* at 46–47.

### C.   The Preliminary Injunction Motion

Defendants filed the PI Motion as soon as they learned of the social media campaign. The PI Motion argued that the social media campaign should be enjoined because it violated three provisions of the settlement agreement. *See* PI Mot. at 33–36. First, Ms. Barber's numerous false statements about the conditions of MCBH violated the non-disparagement provision. *See id.* Second, Ms. Barber breached the confidentiality provision by making statements that implied the settlement amount. *See id.* Third, Ms. Barber violated the non-participation clause by participating with her attorneys in the solicitation campaign. *See id.*

The district court conducted a five-day evidentiary hearing in August 2017. A substantial majority of the hearing related to the false and disparaging comments discussed above. Appellants produced documentary evidence (in the

form of detailed soil closure reports) and testamentary evidence (from the

contractor who oversaw the work), which established that for <u>virtually every home</u>

built by Ohana, <u>Ohana removed all of the soils around the home prior to</u>

<u>construction, and replaced them with clean soils.</u>  *See* Ex. C 23–27, 74–75 (Dkt.

329).  The <u>only</u> Ohana-built homes that were not addressed in this way were a

small and unique 10-home neighborhood that did not have any exceedances and

another small neighborhood that contained historic preservation homes.  *See Id.* at

23–27.  There is <u>absolutely no evidence</u> that Defendants failed to remove at least

18 inches of contaminated soil; that Defendants exposed residents to pesticide

levels that were "20 times higher than EPA safety recommendations"; that

Defendants exposed residents to "some of the most toxic . . . chemicals known to

man"; that "living in these contaminated neighborhoods exposes residents, your

children and pets to much higher lifetime rates of cancer and many other diseases";

or any of the other false and disparaging statements made by Ms. Barber.

This lengthy evidence is not cataloged herein because all of the

allegations in the PI Motion must be accepted as true for the purposes of a motion

to dismiss.  *See Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1073 (9th

Cir. 2010) (noting that Court must construe all allegations "in the light most

favorable" to the non-moving party, "taking all their allegations as true and

drawing all reasonable inferences from the complaint in their favor") (brackets

omitted).  However, a summary of the evidence is contained in the DQ Motion at 6–9, 16–19.

### D.     The District Court's Order and the Subsequent Appeal

The Court was close to concluding the evidentiary hearing on the PI Motion on its fifth day, but the parties were unable to complete the last witness. The Court had a previously scheduled court closure, which required the conclusion of the hearing to be scheduled in approximately a month.  *See* Ex. E at 61–62 (Dkt. 374).  However, because the issue of whether Ms. Barber had breached the confidentiality provision did not require any further testimony, the Court stated that it would issue a ruling on that issue prior to its closure.  *See id.*  On August 26, 2018, the Court issued its order finding that Ms. Barber's breach of the confidentiality provision justified injunctive relief.  *See* Order Granting, in Part, Defs.' PI Motion (Dkt. 341).

Ms. Barber appealed, making two primary arguments:  (1) that, according to the language in the parties' Stipulation for Dismissal, the district court's jurisdiction expired on August 25, 2016; and (2) that there was insufficient evidence of irreparable harm stemming from the breach of the confidentiality provision.  *See* Memo. Op. (Dkt. 391).  The Ninth Circuit ultimately ruled in favor of Defendants on the first issue and in favor of Ms. Barber on the second issue. *See id.*

On remand, Defendants argued that the focus of the PI Motion had

been Ms. Barber's statements in violation of the non-disparagement provision, and

that the evidentiary hearing should be resumed so that the last witness could be

completed.  *See generally* Memo. Re: Issues Identified by the Ct. Following

Remand From the Ninth Cir. (Dkt. 409).  Ms. Barber, on the other hand, argued

that the Ninth Circuit's holding with respect to Ms. Barber's breach of the

confidentiality provision also meant that any breach of the non-disparagement

provision could not constitute irreparable harm.  *See* Memo. Re: Scope of the

Ninth Cir. Ct. of Appeals' Remand and Issues Remaining in the Case at 4–6 (Dkt.

408).  The Court held that Ms. Barber's interpretation of the Ninth Circuit's

Opinion was correct, and denied the PI Motion.  *See* Minute Order (Jan. 10, 2018)

(Dkt. 412).

### E.    The Second Appeal and *Barber II*

Defendants appealed the denial of the PI Motion, arguing that the

evidence of irreparable harm was much more extensive with respect to the non-

disparagement provision than the confidentiality provision:

> The breaches of the non-disparagement provision
> are much more serious than the breaches of the
> confidentiality provision and are based on scores
> of statements made across numerous internet
> platforms.  Hawai'i law is clear that statements
> like those made by Ms. Barber constitute
> irreparable reputational harm <u>as a matter of law</u>.
> Moreover, it is apparent from the content,

> frequency, and nature of these statements, as well
> as individual's reactions on Facebook, that they are
> causing irreparable harm to Defendants' reputation
> and business goodwill.

Opening Brief at 5.  Defendants presented significant law and evidence in support

of this argument.  *See id.* at 43–53.

The timing of the second appeal put Defendants in a difficult

situation.  Because Ms. Barber's social media campaign is believed to have begun

shortly after the parties entered into the settlement agreement in February 2016,

that date represented a conservative date to use for purposes of calculating the

statute of limitations.  Some of the claims that Defendants had against Ms. Barber

had a two-year statute of limitations, which meant that Defendants would need to

file any action against Ms. Barber prior to February 2018 in order to avoid issues

with the relevant statutes of limitation.  If Defendants did not file an independent

complaint by that date, and if the appeal was not granted, Defendants would

potentially lose the opportunity to obtain relief related to Ms. Barber's social media

campaign.  Therefore, Ohana and FCRM filed a Complaint against Ms. Barber on

January 31, 2018 in *Ohana Military Communities, LLC, et al. v. Cara Barber*,

1:18-cv-00042 ("*Barber II*").  *See* Ex. F.  The Complaint asserts claims for

defamation, false light, tortious interference with contract, tortious interference

with prospective economic advantage, and false advertising.  *Id.*

14

The Ninth Circuit issued its ruling on the second appeal on June 25, 2018. *See* Memo. Op. (Dkt. 434). It held that "the district court erred when it interpreted our prior disposition as holding that the entire record failed to demonstrate a likelihood of irreparable harm for all relevant settlement provisions instead of limiting our ruling to the confidentiality provision." *Id.* at 3. The Ninth Circuit further held that, "With this clarification of the scope of our prior disposition, we leave it to the district court on remand to consider Defendants' preliminary injunction and disqualification motions in the first instance." *Id.* at 5.

## III.   ARGUMENT

### A.   Ms. Barber's Social Media Campaign Has Caused Irreparable Harm to Defendants

It is well-established that statements that negatively impact business goodwill and reputation cause harm that is considered "unquantifiable" and "irreparable" for the purposes of injunctive relief. *MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1305 (C.D. Cal. 2007); *see, e.g., Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[W]e have also recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."). Such harm frequently serves as a basis for granting injunctive relief. *See, e.g., Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of

the possibility of irreparable harm.").  Indeed, the Ninth Circuit has already held <u>in this case</u> that "damage to reputation can" "support a finding of irreparable harm." Memo. Op. at 3 (Dkt. 391).  Here, there is significant evidence that Ms. Barber's statements in violation of the non-disparagement provision harmed Defendants' reputations, and, if not enjoined, will continue to irreparably harm Defendants' reputations.

### 1.    Under Hawai'i Law, There Is a Presumption That Ms. Barber's Statements Constitute Irreparable Harm

Most fundamentally, Hawai'i law has long recognized that reputational harm is <u>presumed</u> for certain categories of statements that constitute libel *per se*.  *See Murphy v. Maui Pub. Co.*, 23 Haw. 804, 809 (1917) (upholding finding of libel despite admission from plaintiff that "he knows of no business he has lost by reason of the alleged libelous publication"); *Kahanamoku v. Advertiser Pub. Co.*, 25 Haw. 701, 715 (1920).  The libel *per se* categories include:

> (1) Libels which impute to a person the commission of a crime.

> (2) Libels which have a tendency to injure him in his office, profession, calling or trade.

> (3) Libels which hold him up to scorn and ridicule and to feelings of contempt or execration, impair him in the enjoyment of society and injure those imperfect rights of friendly intercourse and mutual benevolence which man has with respect to man.

16

*Partington v. Bugliosi*, 825 F. Supp. 906, 915 (D. Haw. 1993) (finding that

allegation that individual "works for the South African government" was libel *per*

*se* under both the second and third categories because of the "human rights

violations committed by the South African government"); *see also Russell v. Am.*

*Guild of Variety Artists*, 53 Haw. 456, 458, 497 P.2d 40, 42 (1972) (discussing

categories of libel *per se*).   Because libel *per se* establishes reputational harm <u>as a</u>

<u>matter of law</u>, it satisfies the requirement that there is a likelihood of irreparable

harm on a motion for preliminary injunction.

Here, nearly all of Ms. Barber's disparaging statements fall into the

second and third categories of libel *per se*.   Defendants' "profession, calling or

trade" is developing, managing, and leasing military housing.   Ms. Barber's

statements go directly to Defendants' fitness to perform these activities and

services.   *See* Section II.B, *supra*.   The overarching message Ms. Barber sought to

convey by these statements is plain:  Defendants provide dangerously unsafe

housing that is unfit to live in.   This directly relates to Defendants' "profession,

calling or trade."

The third category captures statements that damage Defendants'

standing "in the community at large."   *Partington*, 825 F. Supp. at 916.   The fact

that Ms. Barber asserts that Defendants are exposing thousands of military service

members and their families to dangerously unsafe housing is sufficient, by itself, to

bring her statements within this category.  But Ms. Barber goes even further, asserting that Defendants <u>intentionally</u> exposed residents to dangerous hazards for the purpose of saving money and increasing profits.[3]  She simultaneously juxtaposes this against the sacrifices made by military service members and the unique issues they face.[4]  By doing so, Ms. Barber is intentionally trying to subject Defendants to scorn and ridicule in the community at large—the precise conduct the third class of libelous *per se* statements is designed to prevent.

In addition, several of Ms. Barber's statements also fall into the first category of statements, as she has accused Defendants of having committed criminal violations and "multiple, flagrant violations of public health and environmental laws, rules, and regulations."  *See*, *e.g.*, *id.* ("Military families are the perfect victims of this type of crime."); PI Ex. 10 at 8 (Dkt. 325-5 ) ("Another idea Rebecca Leigh Johnson, might be to pressure the DA to pursue CRIMINAL

---

[3] *See*, *e.g.*, PI Ex. 6 at 31–32 (Dkt. 322) ("Apparently, FC/OMC deemed this means of resolution to the contamination problem too costly and time consuming, as it would've cost tens of millions of dollars and likely caused significant project delays."); PI Ex. 10 at 13 (Dkt. 325-5) ("It's so wrong and disturbing on so many levels be/c corporate profits are prioritized over the health and safety of thousands of military children, service members and their families.").

[4] *See*, *e.g.*, PI Ex. 6 at 45 (Dkt. 322) ("Military families deserve much better this. Ironically, service members are trained and prepared to protect and defend our country, but they're denied the right to protect their own children and families . . . ."); *id.* at 53 ("Military families are the perfect victims of this type of crime.  We are trained to follow orders from those exposing us and our families to undisclosed and unacceptable health risks.").

CHARGES against them relative to all the laws, rules and regulations FC broke and Hunt continues to break.").

Because Ms. Barber's statements satisfy the requirements for libel *per se*, they establish irreparable harm to Defendants' reputation as a matter of law.

### 2. The Statements Themselves—Including their Content, Audience, and Frequency—Plainly Demonstrate a Likelihood of Irreparable Harm

Separate and apart from the presumption for libel *per se*, the context and content of the statements themselves also establish that they are likely to cause irreparable harm.  <u>First</u>, it is plain from the content of the statements that they would cause irreparable harm to the reputation of a lessor and manager of residential property.  *See*, *e.g., Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1320 (11th Cir. 2010) (affirming district court's finding that defendant's advertisements, on their face, would likely cause irreparable harm because the ads contained "serious indictments of the safety of MCQ-treated products that would likely be remembered by consumers"); *Church & Dwight Co., Inc. v. Clorox Co.*, 840 F.Supp.2d 717, 723 (S.D.N.Y. 2012) ("In such circumstances, where the misrepresentation is so plainly material on its face, no detailed study of consumer reactions is necessary to conclude inferentially that Clorox is likely to divert customers from C&D's products to its own unless the offending commercial is enjoined."); *Vecoplan LLC v. Ameri-Shred Corp.*, 335 F. Supp. 2d 657, 658

(M.D.N.C. 2004).  It is simply indisputable that falsely claiming that Defendants exposed residents to unsafe levels of highly toxic pesticides, caused "much higher" rates of cancer, and violated environmental and criminal statutes (among numerous other disparaging statements) would cause significant harm to Defendants' business reputation and goodwill.

Second, the audience that Ms. Barber's statements was directed at increased the likelihood of irreparable harm, because the individuals who read the statements were current and former service members—*i.e.*, the only customers for Defendants' military housing.  The disparaging statements that were made on Ms. Barber's Facebook page were automatically distributed to her more than 1,800 followers, *see* Ex. D 23–24 (Dkt. 338), and the disparaging statements she made on her blog were automatically distributed to her 1,583 followers, *see* PI Ex. 6 at 78 (Dkt. 322).

Third, the availability and accessibility of the statements also support the likelihood that they will cause irreparable harm.  All of the comments were available on Ms. Barber's public Facebook page, her public blog, her public YouTube account, and her public, free-standing website.  Ex. D at 24 (Dkt. 338); Ex. A at 14–15, 40–42 (Dkt. 323).  Anyone with an Internet connection could access any of these sources.  *See id.*  Moreover, these sources were easily locatable through internet searches.  *See id.*

<u>Fourth</u>, the frequency and amount of the statements strongly support the likelihood of irreparable harm. *See* Section II.B, *supra*.

<u>Lastly</u>, although Ms. Barber blithely denies it, the disparagement campaign was carefully coordinated to coincide with her attorneys' solicitation efforts. *See* DQ Motion 13–16. The same posts that contained the disparaging statements encouraged residents to contact Ms. Barber's attorneys; encouraged current and former residents to file lawsuits against Defendants; and, in some cases, even included copies of the solicitation letter. *See, e.g.,* PI Ex. 10 at 1 (Dkt. 325-5). This careful coordination between the disparaging statements and the solicitation campaign further shows the likelihood of irreparable harm by encouraging a multitude of new claimants.

### 3.    This Is the Rare Case Where There Is Direct Evidence of Reputational Harm

In addition to the above, the nature of the Facebook platform makes this the unique case where there is direct evidence of the impact Ms. Barber's statements had on the goodwill and business reputation of Defendants.

For instance, on May 11, 2016, Ms. Barber made a Facebook post that included the attorney solicitation letter and encouraged individuals to contact Ms. Barber's attorneys and file lawsuits against Defendants. *See id.* at 1. In the numerous pages of comments related to the May 11 post, Ms. Barber repeated many of the disparaging statements, such as claiming:

21

- Defendants had broken "rules, regulations and laws," *id.* at 6;

- Defendants caused "thousands of young, military families to be exposed to much higher rates of cancer and other diseases," *id.* at 6;

- "Evidence (testing, etc.) proves that at the VERY LEAST, contamination levels are 20 TIMES HIGHER THAN EPA SAFETY RECOMMENDATIONS[,]" *id.* at 8;

- individuals should "pursue CRIMINAL CHARGES against [Defendants] relative to all the laws, rules and regulations FC broke," *id.* at 8;

- "Instead of removing 18 inches of highly contaminated topsoil from hundreds of acres of all these contaminated neighborhoods . . . Forest City asked Hawaii Dept of Health (HDOH) to permit unusually high contamination levels," *id.* at 11;

- "AT BEST current contamination levels are expected to be at least 20 times higher than EPA safety recommendations," *id.* at 12;

- "unusually high contamination levels remain in these neighborhoods to this day that pose serious, lifetime health risks to residents and, most especially, their children," *id.* at 13;

- "The laws, rules and regulations to protect human health in residential neighborhoods are NOT ENFORCED in these contaminated, residential neighborhoods on federal lands," *id.* at 13;

- "Leaving contamination levels 20 times higher in residential neighborhoods . . . is absurd!" *Id.* at 13.

The comments from Ms. Barber's followers demonstrate that her statements had the desired effect—they portrayed Defendants in a highly negative light and adversely impacted Defendants' reputation. Readers of these statements expressed their decision to file lawsuits against Defendants, *id.* at 10; expressed their

concerns that their health issues were caused by Defendants, *id.* at 4, 9, 10; shared the post with numerous other Facebook users, *see generally id.* at 1–16; and made numerous other comments that demonstrated harm to Defendants' business reputation and goodwill, *see generally id.* ("Man o man!"; "[I]s Hunt Properties aware of this bag of crap they purchased from FC??"; "the problem with the soil has not been fixed"; "I hate this for you Sarah!!!"; "This is so sad"; "have you seen this?!"; "Oh gosh! How awful!!"; "Terribly sad. I can not believe FC would not disclose."; "Im so glad for social media and forums like this because after reading so much about this issue, makes me want to completely decline living on base."; "I would not live on base if you can help it.").

In another post, on May 8, 2016, Ms. Barber commented: "The basic truths are these neighborhoods are contaminated and this contamination exposes all residents, their children and pets to significantly increased health and exposure risks."  PI Ex. 8 at 1 (Dkt. 325-3).  Ms. Barber then encouraged her followers to contact her attorneys.  The damage to Defendants' reputation is clear from the ensuing comments, such as Jessica Koth, who stated that "reading all of what's gone on there at MCBH makes me extremely concerned" and "I don't trust these companies."  *Id.* at 2.  Heidi Zimmermann stated that she was "[f]ollowing this very closely" and noted that she was becoming concerned about other Forest City properties outside of Hawai'i.  *See id.*  Brett McGinn asked what "current

residents" could do to "keep an eye" on Defendants. *Id.* at 3. And to be clear, the comments to these two posts are simply examples—other posts similarly demonstrate the harm to Defendants' reputation.

In summary, there is substantial evidence that Ms. Barber's comments created a likelihood of irreparable harm, including the presumption of reputational harm created by Hawaiʻi's law governing libel *per se*; the content, nature, and context of the statements; and the reactions of Ms. Barber's Facebook followers. Tellingly, <u>Ms. Barber does not even attempt to argue that these statements do not cause irreparable harm to Defendants' reputation</u>.

### B. The Cases Cited by Ms. Barber Do Not Support Her Contention That Injunctive and Monetary Relief Are Mutually Exclusive

Ms. Barber fails to cite any case law supporting her argument that a party cannot simultaneously seek injunctive and monetary relief. The case law she cites merely illustrates the general rule that economic injury <u>alone</u> may be insufficient to obtain injunctive relief.

For instance, Ms. Barber cites *American Promotional Events, Inc. v. City & County of Honolulu*, 796 F.Supp.2d 1261 (D. Haw. 2011), for the proposition that: "The inherent inconsistency between a party seeking injunctive relief and monetary damages for the same alleged conduct has been noted by this court in several prior cases." MTD at 7. But *American Promotional* did <u>not</u> say that the two forms of relief are mutually exclusive. In that case, a fireworks

company brought a preliminary injunction motion to enjoin a new ordinance that banned certain fireworks. *See id.* at 1264. The Court began its analysis of irreparable harm by noting that "[t]he primary injuries alleged by Plaintiff relate to monetary harm"—namely, a warehouse it would no longer need. *Id.* at 1283. The Court did not then immediately stop its analysis because monetary damages <u>necessarily excluded</u> injunctive relief. Rather, the court went on to analyze whether, <u>despite the fact that plaintiff was primarily seeking monetary relief</u>, there was nevertheless sufficient evidence of irreparable harm to also justify injunctive relief. *See id.* at 1283–84. In so doing, the Court noted that loss of reputation and goodwill can be considered irreparable harm. *See id.* ("Injuries to goodwill and business reputation are generally considered to be intangible and, as a result, irreparable."). But because the plaintiff in *American Promotional* did not produce evidence of loss of goodwill or harm to business reputation, the Court did not find irreparable injury. *See id.* at 1284.

The other cases cited by Ms. Barber similarly fail to support her claim that "case law clearly prohibits a party from seeking injunctive relief and simultaneously pursuing monetary damages." MTD at 5. Instead, the cases merely emphasize the general rule that economic injury alone is insufficient to find irreparable harm. Moreover, in nearly every one of these cases the plaintiff sought both monetary relief <u>and</u> injunctive relief. The courts did not consider the fact that

25

plaintiff sought monetary relief to be a bar to injunctive relief; instead, the courts considered whether plaintiff had made a sufficient showing of irreparable harm in addition to monetary damages.  *See, e.g., Hi-Tech Rockfall Constr., Inc. v. County of Maui*, No. CV08-00081 DAE-LEK, 2008 WL 659789, at *8–9 (D. Haw. Mar. 11, 2008) (cited by MTD at 8 n.16) (finding that plaintiff "ha[d] demonstrated a possibility of irreparable harm" despite the fact that plaintiff could recover monetary damages related to the cost of bid preparation; ultimately denying injunctive relief based upon public interest exception); *Goldie's Bookstore, Inc. v. Sup. Ct. of State of Cal.*, 739 F.2d 466, 467–68 (9th Cir. 1984) (cited by MTD at 8 n.15) (reversing injunction where plaintiff alleged economic injury but failed to include "any factual allegations" related to loss of goodwill); *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 850–51 (9th Cir. 1985) (MTD at 8 n.15) (denying injunctive relief where "economic loss [was] the only type of harm that [movant] might possibly suffer").

Because Defendants have alleged irreparable injuries stemming from Ms. Barber's wrongful conduct over and above economic injuries, *see* Section III.A, *supra*, these cases are inapposite and do not support Ms. Barber's assertions.

### C.   There Is Nothing Inconsistent or Improper About Seeking Injunctive Relief In This Action and Damages in *Barber II*

#### 1.   *Barber II* Was Necessitated by the Unique Procedural Posture of This Case and the Court's Limited Jurisdiction

Defendants filed the PI Motion as soon as they learned of

Ms. Barber's new social media campaign.  They sought injunctive relief in this

Court because Defendants believed that the Court's experience with the putative

class action put the Court in the best position to enforce the terms of the parties'

settlement agreement and stop the highly damaging social media campaign.

Unfortunately, the relief sought by Defendants was delayed by the two appeals,

and the timing of the second appeal put Defendants in a difficult situation.

Because Ms. Barber's social media campaign is believed to have begun shortly

after the parties entered into the settlement agreement in February 2016, *see* PI Ex.

P (ECF. No. 290), that date represented a conservative date to use for purposes of

calculating the statute of limitations.  Some of the claims that Defendants had

against Ms. Barber had a two-year statute of limitations, which meant that

Defendants would need to file any action against Ms. Barber prior to February

2018 in order to avoid issues with the relevant statutes of limitation.  *See, e.g.*,

Haw. Rev. Stat. § 657-4 ("All actions for libel or slander shall be commenced

within two years after the cause of action accrued, and not after.").

This Court dismissed the PI Motion on January 10, 2018. *See* Minute Order (Jan. 10, 2018) (Dkt. 412). Although Defendants knew they would appeal that decision, they also knew that the results of that appeal would not be available prior to February 2018, which was then just three weeks away. (In fact, the Ninth Circuit's decision was not issued until June 25, 2018, more than two years after Ms. Barber had begun the social media campaign. *See* Memo. Op. (Dkt. 434).) If Defendants had not filed a new complaint against Ms. Barber, Defendants risked a situation where they had no way to address Mrs. Barber's social media campaign. Therefore, on January 31, 2018, Defendants initiated *Barber II*. *See* Ex. F (Complaint).

In order to ensure that there was no duplication of claims between the PI Motion and the new action, the Complaint in *Barber II* did not assert any claims based upon the Settlement Agreement and did not seek injunctive relief. Instead, Defendants sought damages for those aspects of Ms. Barber's misconduct that were compensable. For instance, after Ms. Barber's social media campaign, Defendants spent significant amounts sampling and testing the soils at MCBH to confirm that none of the soils contained organo-chlorinated pesticides above Tier 1 Environmental Action Levels.[5] Ohana and FCRM limited the relief they sought in

---

[5] This testing confirmed that all samples were below Tier 1 Environmental Action Levels ("EALs"). Tier 1 EALs are screening levels that are so low that sites with OCPs at these levels are considered safe for all circumstances without any further

the second action to monetary damages because Defendants were already seeking injunctive relief in this action, <u>not</u> because Defendants believed injunctive relief was no longer proper and <u>not</u> because Defendants were giving up on injunctive relief.

**2. Courts Regularly Award Damages and Injunctive Relief for the Same Underlying Conduct**

It is not inconsistent to seek both injunctive and monetary relief given that the two types of relief can compensate for distinct harms. Monetary damages, for example, may compensate for past harms while an injunction can prevent future harm. Numerous courts have recognized the availability of both remedies, <u>including in separate actions</u>. Indeed, even the cases cited by Ms. Barber recognized the possibility of awarding both monetary and injunctive relief for the same underlying conduct. *See* Section III.B, *supra*.

The Seventh Circuit's decision in *Matter of Hallahan*, 936 F.2d 1496 (7th Cir. 1991), is instructive. There, the Seventh Circuit affirmed an award of monetary damages in a second action following a grant of injunctive relief in a prior action. *See id.* at 1499. Nelson Hallahan sold insurance policies for NIS Corporation ("NIS"), and entered into a non-compete agreement with his

---

analysis or remediation. *See* DOH, *Evaluation of Environmental Hazards*, Vol. 1, §§ 2.1, 2.4.1 (Fall 2011; rev. Jan. 2012) *available at* http://eha-web.doh.hawaii.gov/eha-cma/documents/8935e423-25fb-46b9-adaa-fc0a207d5518.

employer. *See id.* at 1498. After NIS terminated Mr. Hallahan and he began

working for a competitor, NIS's parent company brought an action in federal court

seeking a permanent injunction based on the non-compete agreement. *See id.* at

1499. The federal court enjoined Mr. Hallahan from selling certain policies. *See*

*id.* Mr. Hallahan later filed for bankruptcy in Illinois, and NIS filed a proof of

claim seeking to recover money damages based on the same conduct that the first

action was based upon. *See id.* After a trial on damages, the bankruptcy court

awarded over $200,000 in damages for lost profits, as well as attorneys' fees. *See*

*id.* The Seventh Circuit affirmed:

> As a preliminary matter, we dispose of Hallahan's
> argument that plaintiffs cannot pursue this suit for
> money damages after having obtained injunctive
> relief from the federal district court in the Western
> District of Missouri. . . . [T]his suit does not
> threaten to compensate plaintiffs twice for the
> same wrong, in violation of the doctrine of the
> election of remedies. In Missouri, plaintiffs
> obtained an injunction preventing Hallahan from
> future breaches of the covenant not to solicit. In
> bankruptcy court, they sought monetary damages
> for breaches which had occurred prior to issuance
> of the preliminary injunction. <u>The election of
> remedies doctrine does not prevent a party who has
> obtained an injunction covering one period of time
> to seek damages for injuries inflicted before the
> injunction took effect</u>.

*Id*. at 1499 n.2 (citations omitted; emphasis added).

Hawaiʻi law is in accord.  For instance, in *Pelosi v. Wailea Ranch Estates*, 91 Hawaiʻi 478, 985 P.2d 1045 (1999), plaintiff lot owner sued developer claiming that certain restrictive covenants prohibited the construction of developer's tennis court.  *See id.* at 482, 985 P.2d at 1049.  After a series of proceedings and appeals, the Hawaiʻi Supreme Court concluded that plaintiff should have been awarded both nuisance damages <u>and</u> injunctive relief.  *See id*. at 492–93, 985 P.2d at 1059–60.

> "It is well established that, in a jury trial of an action seeking equitable and legal remedies, the jury decides legal questions and awards legal damages and the court decides equitable questions and awards equitable relief."  <u>In the present matter, the jury awarded [plaintiff] Pelosi $20,000 for damages he had already suffered.  An injunction would be awarded to enjoin the defendants from any *future* breach. The individual defendants' caution against double recovery is, therefore, unfounded.</u>

*Id*. at 4493, 985 P.2d at 1060 (citations omitted; italics in original); *see also Airgo, Inc. v. Horizon Cargo Transp., Inc*., 66 Haw. 590, 593, 670 P.2d 1277, 1280 (1983) ("The injunction to compel performance of the contract clearly did not bar a claim for damages because of breaches of it.").  Numerous other courts have also

recognized that awarding damages and injunctive relief based upon the same underlying conduct does not constitute double recovery.[6]

Here, Ms. Barber has not even <u>attempted</u> to explain how awarding injunctive relief in this action and damages in *Barber II* would constitute duplicative remedies. In this action, Defendants seek injunctive relief that would require Ms. Barber to remove the social media posts at issue and refrain from re-posting them in the future. This would necessarily protect Defendants from <u>future</u> harm caused by the posts, but would not remedy any harm caused during the time period that the posts were online. As the numerous cases cited herein make clear, Defendants are permitted to recover damages for that harm.

---

[6] *See, e.g.*, *Teutscher v. Woodson*, 835 F.3d 936, 956–57 (9th Cir. 2016) ("There are several ways in which [the plaintiff] likely could have pursued legal and equitable relief <u>at the same time</u>. Among them, he could have pursued only back pay from the jury and sought a forward-looking remedy only from the court in equity.") (emphasis added); *TMRJ Holdings, Inc. v. Inhance Techs., LLC*, 540 S.W.3d 202, 208–09 (Tex. App. 2018) (holding that award of royalty damages and grant of permanent injunction were not duplicative remedies) ("[A] damages award that compensates a plaintiff for past damages <u>combined with</u> [injunctive] relief to prevent future damages <u>does not constitute a double recovery</u>.") (emphasis added); *Pinnacle Healthcare, LLC v. Sheets*, 17 N.E.3d 947, 954–45 (Ind. Ct. App. 2014) (recognizing that "money damages and injunctive relief serve different purposes" and that the "<u>injunctive remedy was meant to prevent future violations of the agreement</u>") (citations omitted and emphasis added); *Brighton Collectibles, Inc. v. Marc Chantal USA, Inc*., No. 06-CV-1584 H (POR), 2009 WL 10674087, at *2–3 (S.D. Cal. May 12, 2009) (granting motion for permanent injunction after jury verdict and award of damages) ("Though Brighton was awarded substantial damages, the Court recognizes that <u>compensatory damages cannot protect against the threat of future infringement</u>.") (emphasis added).

**D.     Ms. Barber Has Misrepresented the Hearing on the Motion to Dismiss in Barber II**

Ms. Barber filed a motion to dismiss *Barber II*, arguing that the claims were barred by *res judicata* because this Court denied the PI Motion.  *See* Ex. G. In opposition, Defendants argued, among other things, that a denial of a preliminary injunction motion is not a decision on the merits for the purposes of *res judicata*.  *See* Ex. H.  The Court denied the motion to dismiss, noting that "the claims in Plaintiffs' Complaint in this action could not have been properly litigated in *Barber I* because, at that point, the district court lacked jurisdiction to adjudicate such claims."  *See* Ex. I at 9.

In the current motion, Ms. Barber places great import on answers that Defendants' counsel gave during the hearing on the motion to dismiss.  Ms. Barber claims that, at the hearing, "OMC argued . . . that it could bring a new action for damages for alleged defamation because this Court had not yet ruled on the motion for preliminary injunction and because OMC was now seeking damages for its [sic] Barber's alleged defamatory comments rather than an injunction."  Mot. at 9 (emphasis added).  This is false—counsel never stated that Ohana or FCRM were seeking damages and giving up on injunctive relief.  The statement made by counsel was that Ohana and FCRM were exclusively seeking damages in *Barber II*, not that Ohana and FCRM were abandoning the PI Motion.  *See, e.g.*, MTD, Ex. 1 at 15:11–14 ("I could look through the complaint, but, Your Honor, if

you look at the prayer for [] relief, we're seeking monetary damages <u>here</u>.  We're certainly on the record now as having stated that.") (emphasis added).  At the hearing, Defendants made clear that they were <u>continuing to pursue</u> the PI Motion and that they intended to "complete the preliminary injunction proceeding." *See id.* at 14:24–15:2.

Ms. Barber also places great emphasis on the fact that "Mr. Whattoff argued OMC was allowed to bring its New Complaint in reliance on caselaw where the party had *lost* its preliminary injunction."  Mot. at 11 (italics original).  Ms. Barber argues: "[T]he specific legal argument advanced by OMC to support the New Complaint was a situation where the underlying preliminary injunction *was denied*, which then allowed the party to pursue its arguments for damages." *Id.* at 11–12.  This is a *non sequitur*.  Ms. Barber's motion to dismiss *Barber II* was based on her argument that this Court's denial of the PI Motion should be given *res judicata* effect.  To counter this argument, Defendants cited cases where motions for preliminary injunction were <u>not</u> given *res judicata* effect (because they are "preliminary" orders and not decisions on the merits).  The fact that the two cases cited by Defendants happened to be denials <u>was not relevant</u>.

For example, Defendants cited to *Air Terminal Services, Inc. v. Lehigh-Northampton Airport Auth*., No. CIV. A. 96-2314, 1996 WL 460059, at *4–5 (E.D. Pa. Aug. 1, 1996) (*see* MTD, Ex. 1 at 10:19–11:12), in which the court

examined whether the initial preliminary injunction proceedings could preclude a

later second action for damages such that *res judicata* would apply.   In doing so,

the court focused on whether there was a previous final judgment on the merits.

It's holding was <u>not</u> contingent on the outcome of the underlying injunction

proceedings:

> However, equitable relief can have a res judicata effect upon subsequent actions at law only when a valid and final judgment on the merits was entered in the previous action.  In *Consolidation Coal*, the Superior Court found that the <u>**granting** of a preliminary injunction is not a judgment on the merits and, therefore, has no preclusive effect on a subsequent action</u> for damages.  <u>This court finds that the **denial** of the preliminary injunction in this case does not serve as a final judgment on the merits</u>.

1996 WL 460059, at *4 (citations omitted; emphasis added).   Similarly, *I.H.T.*

*Corp. v. News World Communications, Inc*., No. 83 CIV. 3862-CSH, 1984 WL

604, at *3 (S.D.N.Y. July 3, 1984), recognized that findings at the preliminary

injunction stage—whether they be a grant or denial—are not a final judgment for

purposes of *res judicata*: "Because a decision <u>to deny or grant</u> temporary equitable

relief is, by its very nature, interlocutory, tentative, provisional, ad interim,

impermanent, mutable, not fixed or final or conclusive, characterized by its for-

the-time-beingness, . . . such a decision generally has no collateral estoppel

effect[.]"  *Id*. at *3 (citation and quotation marks omitted; emphasis added).

### E.    Judicial Estoppel Is Wholly Inapplicable

Finally, Ms. Barber's arguments relating to judicial estoppel should be quickly rejected.  *See* MTD at 13.  "The doctrine of judicial estoppel serves to bar a party from taking a position in a subsequent lawsuit that is inconsistent with a position it took in a previous lawsuit."  *Ito v. Inv'rs Equity Life Holding Co.*, 135 Hawai'i 49, 74, 346 P.3d 118, 143 (2015).  As the cases cited by Ms. Barber make clear, "[j]udicial estoppel must be applied with caution <u>and in the narrowest of circumstances</u>."  *Lamonds v. Gen. Motors Corp.*, 34 F.Supp.2d 391, 394 (W.D. Va. 1999) (cited in MTD at 14 n.25) (emphasis added).  The doctrine is aimed at preventing the prejudice caused to one party by another's wholly inconsistent approaches.  *See Roxas v. Marcos*, 89 Hawai'i 91, 152 n.19, 969 P.2d 1209, 1270 n.19 (1998) ("[T]he doctrine of judicial estoppel does not apply unless the changed argument *prejudices* the opposing party.  . . .  In other words, a party is free to plead inconsistent claims or defenses within a single action, but a party is precluded from subsequently repudiating a theory of action that has been accepted and acted upon by the court or that has otherwise detrimentally affected the opposing party.") (italics original; citations, brackets and quotation marks omitted); *see also Burmeister v. County of Kaua'i*, No. CV 16-00402 LEK-KJM, 2018 WL 2392499, at *4 (D. Haw. May 25, 2018) ("Judicial estoppel does not apply because the County's prior argument was not accepted and acted upon by the Court.").

Initially, there is no credence to Ms. Barber's claims that Defendants have taken inconsistent positions. Defendants have never made a "judicial admission" that their sole remedy could be money damages and that they would be foregoing injunctive relief. To the contrary, <u>Defendants have always maintained that they are seeking injunctive relief in this action and monetary relief in <em>Barber II</em></u>. As discussed above, it is permissible and common to seek (and possibly ultimately obtain) alternative forms of relief, including injunctive and monetary relief. This is especially true here, given that it would have been impossible to seek monetary relief in this action given the Court's limited jurisdiction. *See* Memo. Op. (Dkt. 391).

This case is nothing like the cases cited by Ms. Barber, where the parties took inconsistent positions as to the underlying facts or the circumstances, to the other party's substantial detriment. *See, e.*g., *Roxas*, 89 Hawai'i at 124, 969 P.2d at 1242 ("By means of her stipulation in this case, Imelda accepted the benefit of maintaining full control over the defense of the Marcos Estate, in which she had a substantial interest. Now that the plaintiffs-appellees have prevailed against the estate, Imelda argues that she was without authority to act as she did in proffering and entering into the stipulation. In other words, she now claims that because of her wrongful act of holding herself out as a proper party for substitution, the

plaintiffs-appellees should now be stripped entirely of their judgment.").

Accordingly, the doctrine of judicial estoppel has no application here.

## IV.   CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this

Court deny Ms. Barber's Motion.

DATED:  Honolulu, Hawai'i, August 16, 2018.

/s/ Randall C. Whattoff
LISA WOODS MUNGER
JOACHIM P. COX
RANDALL C. WHATTOFF
KAMALA S. HAAKE
CHRISTINE A. TERADA

Attorneys for Defendants
OHANA MILITARY COMMUNITIES, LLC
and FOREST CITY RESIDENTIAL
MANAGEMENT, LLC